**SIKORSKY AIRCRAFT CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

Nos. 09–844C, 10–741C.

United States Court of Federal Claims.

Nov. 30, 2011.

Jeffrey A. Hall, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, Illinois, for plaintiff. Of counsel were Shayna S. Cook, Allison W. Freedman, and Georgia N. Alexakis, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, and Karen L. Manos, Gibson, Dunn & Crutcher LLP, Washington, D.C.

James W. Poirier, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne A. Davidson, Director, Steven J. Gillingham, Assistant Director, and Sarah A. Murray, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Sikorsky Aircraft Corporation ("Sikorsky") holds a number of contracts to provide aircraft and spare parts to the United States government. On December 11, 2008, an administrative contracting officer issued a final decision demanding that Sikorsky pay the government approximately $80 million premised on the contention that Sikorsky had improperly allocated certain overhead costs to its government contracts. Sikorsky brought an action on that claim in a complaint filed with the court pursuant to 28 U.S.C. § 1491(a)(2) and 41 U.S.C. § 7104(b) on December 8, 2009. Thereafter, as a protective measure, in light of the subsequent decision of the Federal Circuit in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed.Cir.2010), Sikorsky submitted a claim to a contracting officer requesting a decision on Sikorsky's affirmative defenses to the government's claim. The contracting officer rejected that defensive claim on the ground that he lacked authority to act because the government's claim was in litigation. Sikorsky sought review of that denial via a second complaint filed on October 29, 2010. The two complaints were consolidated by an order issued November 22, 2010.

On the merits, the consolidated cases raise issues concerning the application of the Cost Accounting Standards ("CAS") set out at 48 C.F.R. Chapter 99, Subchapter B, Part 9904, and, specifically, the standards for allocation of direct and indirect costs codified at 48 C.F.R. §§ 9904.418–10 to 9904.418–63. The parties undertook discovery to prepare the issues for judicial resolution but soon reached a virtual impasse over the compass of the issues to be tendered for decision. In an effort to remove at least some of the resulting impediments, the government filed four motions—two motions *in limine*, a motion to dismiss the second complaint, and a motion for leave to serve interrogatories. After submission of numerous, lengthy briefs disputing the thrust and scope of the relevant Cost Accounting Standards and argument at several hearings, the motions have been made ready for decision. In essence, by the pending motions, the parties have asked the court

to provide a general interpretative framework for the most relevant Cost Accounting Standard, 48 C.F.R. § 9904.418, and in particular Section 9904.418–50, to guide their preparation of the consolidated cases for trial and final disposition. Restated another way, the motions reflect the parties' and the court's efforts in this complex case to isolate and resolve relevant issues of law prior to completion of discovery and then, ultimately, trial. *See Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1369 (Fed.Cir.2003).[1]

## BACKGROUND

### A. The Role of the Cost Accounting Standards Board

The Cost Accounting Standards Board ("CASB") was established by Congress in 1970 to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under [f]ederal contracts." Act of Aug. 15, 1970, Pub.L. No. 91–379, sec. 103, § 7A(g), 84 Stat. 796, 797. Congress found uniform cost accounting principles desirable because they would require contractors to report their costs in a comparable way when vying for and performing under contracts with the federal government. Uniform standards, it was thought, would promote fair competition among contractors, allow more government contracts to be competitively bid, and prevent firms from overcharging the government and subsidizing their non-government business. *See, e.g., Extension of the Defense Production Act and Uniform Cost Accounting Standards: Hearing on S. 3302*

*Before the Subcomm. on Prod. & Stabilization of the S. Comm. on Banking & Currency*, 91st Cong. 5–7 (1970) (statement of Sen. William Proxmire).

The five-member CASB [2] since its inception has had "exclusive authority to prescribe, amend, and rescind cost accounting standards, and interpretations of the standards, [which govern] measurement, assignment, and allocation of costs to contracts with the [f]ederal [g]overnment." 41 U.S.C. § 1502; *see also* 48 C.F.R. §§ 9900.000 to 9904.420–63. *See generally* Darrell J. Oyer, *Accounting for Government Contracts—Cost Accounting Standards*, § 1.01 to .05 (2010). Under that authority, the CASB has set out nineteen Cost Accounting Standards, collected at 48 C.F.R. §§ 9904.401 to 9904.420 (CAS 419 does not exist). Of particular interest to the pending motions in this case is CAS 418, which sets out how contractors may distribute indirect costs, such as overhead, among their contracts. Specifically, CAS 418 specifies accounting practices for "the consistent determination of direct and indirect costs," "the accumulation of indirect costs ... in indirect cost pools," and "the selection of allocation measures based on the beneficial or causal relationship between an indirect cost pool and cost objectives." 48 C.F.R. § 9904.418–20.

### B. Basic Cost Accounting Concepts

A direct cost is "any cost which is identified specifically with a particular final cost objective[, *i.e.*, a contract].... Costs identified specifically with a contract are direct costs of that contract." 48 C.F.R. § 9904.418–30(a)(2).[3] Correspondingly, an

---

1. By their briefing, the parties have provided an extensive background and framework for addressing the salient issues of law arising with the Cost Accounting Standards. As the Federal Circuit remarked in *Rumsfeld*, "[t]he interpretation of regulations which are incorporated into government contracts is a question of law.... The views of ... self-proclaimed CAS experts ... [are] simply irrelevant ... [and] should not be received, much less considered, ... on the interpretative issue. That interpretative issue is to be approached like other legal issues—based on briefing and argument by the affected parties." 315 F.3d at 1369 (quotation marks omitted).

2. The members include the Administrator of the Office of Federal Procurement Policy, represen-

tatives of the Department of Defense and the General Services Administration, a representative of industry, and a representative of the private sector knowledgeable about cost accounting. *See* 48 C.F.R. § 9901.304.

3. For example, a firm may have "various classifications of engineers whose time is spent in working directly on the production of the goods or services called for by contracts.... [D]etailed time records are kept of the hours worked by these engineers, showing the job/account numbers representing various [contracts]. On the basis of these detailed time records, [the firm] allocates the labor costs of these engineers as direct labor costs of [the contracts]." 48 C.F.R. § 9904.418–60(a).

indirect cost is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective." *Id.* § 9904.418–30(a)(3).[4] Indirect costs are accumulated in "indirect cost pools." *Id.* § 9904.418–40(b).[5] Both direct and indirect costs are allocated to cost objectives: "Allocate means to assign an item of cost, or a group of items of cost, to one or more cost objectives. This term includes both direct assignment of cost and the reassignment of a share from an indirect cost pool." *Id.* § 9904.418–30(a)(1). Indirect costs are apportioned according to an allocation method (also termed an allocation base, allocation basis, or cost driver), the selection of which is subject to detailed criteria. *See id.* § 9904.418–50. An allocation method, essentially, guides how an indirect cost is to be distributed among multiple cost objectives. For an indirect cost, an allocation method should be chosen based on the "causal or beneficial relationship," *id.* § 9904.418–40(c), between the indirect cost pool and the final cost objectives, *i.e.*, the allocation base should distribute the indirect cost to final cost objectives in a manner accurately reflecting each cost objective's fair share of the indirect cost.[6]

### C. Allocation Measures for an Indirect Cost Pool

The CASB took up the project of setting out proper allocation measures for indirect cost pools in the late 1970s. In 1978, the CASB published a proposed rule to establish five Cost Accounting Standards, namely, "Distinguishing Between Direct and Indirect Costs," "Allocation of Service Center Costs," "Allocation of Material–Related Overhead Costs," "Allocation of Manufacturing ... Overhead Costs," and "Allocation of [Other] Indirect Costs." *See* Cost Accounting Standards: Indirect Cost Allocation, 43 Fed.Reg. 11,118 (proposed Mar. 16, 1978). For each category of indirect costs, the corresponding standard set out acceptable allocation methods. *See id.* at 11,120, 11,122–24, 11,127.

In 1979, in response to many comments expressing concern that the 1978 standards would lead to a proliferation of indirect cost pools, the CASB reduced the number of proposed Cost Accounting Standards from five to three. *See* Cost Accounting Standards; Indirect Cost Allocation, 44 Fed.Reg. 42,988, 42,988 (proposed July 23, 1979). The standards for material-related pools and manufacturing overhead pools were merged into one standard titled "Allocation of Overhead Costs of Productive Functions and Activities." *Id.* at 42,988, 42,990–91. Additionally, the standards for allocating service center pools and other indirect cost pools were merged into one standard titled "Allocation of Indirect Cost Pools." *Id.* at 42,988–90. A standard remained for "Distinguishing Be-

---

**4.** "Cost objective" is defined as "a function, organizational subdivision, contract or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capitalized projects, etc." 48 C.F.R. § 9904.410–30(a)(4). In turn, "[f]inal cost objective means a cost objective which has allocated to it both direct and indirect costs, and, in the contractor's accumulation systems, is one of the final accumulation points." *Id.* § 9904.410–30(a)(5). These definitions apply to CAS 418. *See id.* § 9904.418–30(b).

**5.** For example, "costs relating to building ownership, maintenance, and utilities [may be accumulated] into one indirect cost pool designated 'Occupancy Costs.'" 48 C.F.R. § 9904.418–60(c).

**6.** A relatively straightforward example would arise if two families, one of two adults and a child, the other of just two adults, shared a $60 meal. The $60 could be allocated between the families by several allocation measures. If the child eats little, it would be sensible to select the number of adults as the allocation measure: $60 divided among four adults is $15 per adult, and there are two adults per family, so each family would bear $30 of the cost. If the child eats as much as the adults, then a suitable allocation measure would be the number of persons: $60 divided among five persons is $12 per person, so the three-person family would bear $36 and the two-person family $24. *See* Ramji Balakrishnan et al., *Managerial Accounting* 88–90 (2009). If the child is a teenager who eats an extraordinary amount, a pounds-eaten allocation measure would be more appropriate. Assuming six pounds of food is eaten at the dinner, the food cost of $60 would be allocated at a rate of $10 per pound. If the four adults eat one pound each, and the child eats two pounds, the two-adult family, together eating 2 pounds, would bear $20 in costs, while the family with the child, together eating 4 pounds, would bear $40 in costs. For a more sophisticated example, see 48 C.F.R. § 9904.418–60(e).

tween Direct and Indirect Costs." *See id.* at 42,988. As with the 1978 proposal, the revised proposed standards published in 1979 set out acceptable allocation methods for the various kinds of indirect cost pools. *See id.* at 42,993–94, 42,996–97.

In 1980, after receiving further comments and criticisms, the CASB promulgated its final rule. *See* Allocation of Direct and Indirect Costs; Cost Accounting Standard, 45 Fed.Reg. 31,929 (May 15, 1980) (codified at 48 C.F.R. § 9904.418). In light of the comments, the CASB determined that it was "appropriate to reduce the degree of specificity" in the 1979 proposal, and "as a consequence," it consolidated the three proposed standards into one. *Id.* at 31,929. The final standard specified requirements for two kinds of indirect cost pools: Subsection 418–50(d) stated that "an indirect cost pool which includes a material amount of the costs of management or supervision of activities involving direct labor or direct material costs," 48 C.F.R. § 9904.418–50(d), must be allocated using "a base representative of the activity being managed or supervised," *id.* § 9904.418–50(d)(1), typically, a direct labor hour or cost base, *id.* § 9904.418–50(d)(2). Correlatively, Subsection 418–50(e) specified that "indirect cost pools that do *not* include material amounts of the costs of management or supervision of activities involving direct labor or direct material costs" must be allocated using a base that is "an appropriate measure of resource consumption." *Id.* § 9904.418–50(e) (emphasis added). The difference between the two modes of allocation thus turned on whether the indirect cost pool to be allocated included a material amount of the costs of management or supervision or not. *Compare id.* § 9904.418–50(d), *with id.* § 9904.418–50(e).[7] Those requirements for indirect cost pools have essentially remained in place since their promulgation.

### D. Sikorsky's Allocation Methods

Sikorsky has long collected in an indirect cost pool the costs of its materiel overhead. These are costs "related to the purchase and handling of materi[e]l used in the manufacture of aircraft and spare parts . . . [, including] costs of the purchasing department, of receiving and inspecting the materi[e]l, and of its storage and transportation." Compl. ¶ 2.[8] Prior to 1999, Sikorsky allocated its materiel overhead cost pool to contracts by a materiel cost base. "In other words, Sikorsky allocated a portion of the materi[e]l overhead costs to each [g]overnment and commercial contract based on the cost of materi[el] associated with the contract." Compl. ¶ 20. According to Sikorsky, however, a materiel cost base distorted the relative costs of Sikorsky's contracts because it did not account for the indirect costs of government-furnished materiel ("GFM")—items like engines that the government purchases elsewhere and provides to Sikorsky at no cost for further assembly. Compl. ¶ 22. "As a result, under Sikorsky's pre–1999 accounting practice the value of GFM was not included in the materi[e]l cost base used to allocate the cost of materi[e]l overhead. Because GFM was excluded from the materi[e]l cost base, costs Sikorsky incurred when it received, handled, or inspected . . . GFM were under-allocated to [g]overnment contracts for which that work was performed." Compl. ¶ 23.

Consequently, on January 1, 1999, Sikorsky began allocating its materiel overhead cost pool on a direct-labor-cost basis. Compl. ¶ 32. Sikorsky avers that the Defense Contract Audit Agency ("DCAA") initially contended that Sikorsky's changed practice did not comport with CAS 418. Compl. ¶ 33. However, after Sikorsky responded by explaining the distortion caused by GFM, the Corporate Administrative Contracting Officer ("CACO") monitoring Sikor-

7. The text of each of these subsections of Section 9904.418–50 can be somewhat confusing at first reading because the word "material" is used in two distinctly different ways. In the first usage in each of the subsections, "material" is an adjective meaning significant, and in the second usage, "material" means components or supplies, and is equivalent to the noun "materiel."

For the sake of clarity, each subsequent use of "material" as a noun in this opinion will refer to "materiel."

8. All references to a complaint are to that filed in No. 09–844C, unless otherwise indicated.

sky, Joan Sherwood, approved the change. Compl. ¶¶ 35–36. She found that the changed practice had no material, i.e., significant, impact on CAS-covered contracts but that the government might need to reassess that impact in the future. Compl. ¶¶ 36–37. In contrast, the government avers that CACO Sherwood required continuous monitoring of Sikorsky's new practice and approved the change only because the accounting change did not materially impact CAS-covered contracts "at the moment," but that the changed practice could be found noncompliant in the future if its impact became material. Joint Preliminary Status Report ("JPSR") at 9; see also Answer ¶¶ 36–37.

More than five years later, in October 2004, the DCAA issued an audit report finding that Sikorsky's changed accounting practice was "in potential noncompliance" with CAS 418. Compl. ¶ 38. Sikorsky responded by negotiating with Edward Weisman, the CACO who had replaced CACO Sherwood, regarding the potential-noncompliance finding. Compl. ¶ 45. Sikorsky avers that it reached an agreement with CACO Weisman whereby Sikorsky would change its accounting practice beginning January 1, 2006, and that in exchange the government would consider the DCAA's potential-noncompliance finding resolved. See Compl. ¶¶ 46–50. The government disputes both the existence and effectiveness of any agreement between Sikorsky and CACO Weisman. See, e.g., JPSR at 5; Hr'g Tr. 11:1 to 13:11 (Jan. 5, 2011); Hr'g Tr. 31:19 to 32:17 (Aug. 12, 2010); see also Hr'g Tr. 7:16 to 11:1 (Sept. 27, 2011).

Two years later, on April 5, 2007, Sikorsky's new CACO, Frank J. Colandro, relied on the same DCAA audit report issued in 2004 to submit a fresh notice to Sikorsky stating that its pre–2006 accounting practice potentially violated CAS 418. Compl. ¶ 51. Sikorsky protested that CACO Sherwood had approved its earlier practice and CACO Weisman had resolved the issues arising from the 2004 audit report. Compl. ¶ 52. Nevertheless, Mr. Colandro, on behalf of the Defense Contract Management Agency ("DCMA"), issued a contracting officer's final

decision against Sikorsky. Compl. ¶ 53. The decision found that Sikorsky's pre–2006 accounting practice violated CAS 418, that the practice became material in 2003, and as a result Sikorsky had overcharged the government respecting its contracts. Id. The decision ordered Sikorsky to pay the government $64 million in principal and $15 million in interest. Compl. ¶ 54.

*E. The History of This Case and the Motions Before the Court*

On December 8, 2009, Sikorsky challenged CACO Colandro's determination by filing a complaint in this court. The complaint contends that CACO Colandro's decision misapplied the standards set out in CAS 418, Compl. ¶¶ 55–60, and alleges various defenses (viz., accord and satisfaction, waiver, laches, and statute of limitations) related to the agreements vel non with CACO Weisman and CACO Sherwood, Compl. ¶¶ 61–78.

Approximately seven months after Sikorsky filed its complaint, on June 17, 2010, the Federal Circuit issued its decision in *Maropakis*, 609 F.3d 1323. In light of *Maropakis*, out of an abundance of caution, Sikorsky filed a second claim with its contracting officer reiterating the same affirmative defenses found in its complaint in this court. See Compl., *Sikorsky Aircraft Corp. v. United States*, No. 10–741C (Fed.Cl. filed Oct. 29, 2010). The contracting officer stated that he lacked authority to act on this second claim because of the related litigation in this court. Compl. in 10–741 C ¶ 6. Sikorsky considered the contracting officer's response a denial of its claim and filed a second complaint in this court addressing this response by asserting its affirmative defenses anew. Compl. in No. 10–741 C ¶ 6. The court consolidated the two cases one month later. See Order of Nov. 19, 2010.

The consolidation has added one more issue to what was already an abstruse case.[9] Since the case's beginning, the parties have been unable to agree on the scope of the issues to be determined. See, e.g., JPSR 3–8; Hr'g Tr. 23:14 to 24:5 (Jan. 5, 2011); Hr'g Tr. 19:2 to 20:10 (Sept. 1, 2010). To provide

---

9. Because the second complaint concerns only defenses to the government's claim, each subsequent reference in this opinion to the consolidated cases will refer to a singular "case."

a legal framework for the case going forward, the government has submitted its four motions. The court's rulings on these motions will clarify some central issues and aid the parties' discovery and preparation for trial.

The first motion, filed December 27, 2010, seeks to dismiss Sikorsky's second complaint. The second motion relates to a key issue in this case: the proper application of CAS 418, specifically Subsections 418–50(d) and 418–50(e). Though presented as a motion *in limine*, the motion requires the court to provide the parties with a general interpretative framework regarding Section 9904.418–50. The motion thus has become "central to the case," Hr'g Tr. 5:7 (Mar. 24, 2011), however infelicitous its procedural posture and its briefing history.[10] The third motion is a motion *in limine* to prohibit Sikorsky from introducing certain accounting data into evidence and in effect is an adjunct to the second motion. The government's fourth and final motion is a request to serve interrogatories beyond the 25 allowed under Rule 33 of the Rules of the Court of Federal Claims ("RCFC").

The court heard argument regarding these four motions at hearings held on March 24, 2011, and September 27, 2011, and all are now ready for disposition.

## ANALYSIS

### I. Viability of Sikorsky's Protective, Defensive Claim

As noted, the government's first motion seeks to dismiss Sikorsky's second-filed complaint, No. 10–741 C, for lack of jurisdiction. The Tucker Act grants this court jurisdiction over "any claim against the United States founded ... upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), including "any claim by or against, or dispute with, a contractor arising under [41 U.S.C. § 7104(b)(1) ]," *id.*

§ 1491(a)(2). The statute expressly incorporated into the Tucker Act provides specifically, that "in lieu of appealing the decision of a contracting officer ... to an agency board, a contractor may bring an action directly on [a] claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1). Sikorsky's second complaint, as with its first complaint, rests upon this statutory footing.

While the government's motion to dismiss does not invoke a particular subdivision of RCFC 12, a challenge to the "court's general power to adjudicate in specific areas of substantive law ... is properly raised by a [RCFC] 12(b)(1) motion." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed.Cir.1999); *see also Sarang Corp. v. United States*, 76 Fed.Cl. 560, 565–66 (2007). The party seeking relief must establish by a preponderance of the evidence that the court has subject matter jurisdiction. *Sarang Corp.*, 76 Fed. Cl. at 566 (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir.1988)). All uncontroverted aspects of the complaint are accepted as true and all reasonable inferences are drawn in favor of the party seeking to invoke the court's subject matter jurisdiction. *Liberty Ammunition, Inc. v. United States*, 101 Fed.Cl. 581, 585 (2011) (citing *Hamlet v. United States*, 873 F.2d 1414, 1415–16 (Fed.Cir.1989); *De Maio v. United States*, 93 Fed.Cl. 205, 209 (2010)).

### A. Prerequisites to Suit for a Claim Based on the Contract Disputes Act

The Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–7109,[11] sets out the procedures a contractor must follow to pursue a claim against the federal government. As used in the CDA, a claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of con-

**10.** Briefing of this motion extended over eight and one-half months and involved, among other things, a 106–page reply by the government (along with a 2,316–page appendix), a 47–page surreply by Sikorsky (accompanied by a 135–page appendix), and a 59–page responsive supplemental brief by the government.

**11.** The Contract Disputes Act was recently recodified at 41 U.S.C. §§ 7101–7109, replacing 41 U.S.C. §§ 601–613. *See* Act of Jan. 4, 2011, Pub.L. No. 111–350, sec. 3, §§ 7101–7109, sec. 7(b), 124 Stat. 3677, 3816–26, 3860.

tract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101; *see* Federal Acquisition Regulation; Definition of "Claim" and Terms Relating to Termination, 67 Fed.Reg. 43,513 (June 27, 2002); *H.L. Smith, Inc. v. Dalton,* 49 F.3d 1563, 1564–65 (Fed.Cir.1995) (holding that the definition of "claim" in 48 C.F.R. § 2.101 governs in CDA actions).[12] A claim "must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim,'" *Maropakis,* 609 F.3d at 1327 (quoting *Contract Cleaning Maint., Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987)), and must request, either implicitly or explicitly, a final decision from the contracting officer, *see Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1577 (Fed.Cir.1992), *overruled on other grounds by Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995). The contractor must file its claim within six years of accrual and certify claims seeking more than $100,000. 41 U.S.C. §§ 7103(a), (b). Once a claim is submitted, the contracting officer must issue a decision within sixty days or, for claims over $100,000, notify the contractor of when a decision will be issued. 41 U.S.C. § 7103(f). After a final decision has been issued, the contractor may challenge it by filing a complaint in this court. 41 U.S.C. § 7104(b)(1); *see also Sharman Co. v. United States,* 2 F.3d 1564, 1568 n. 6 (Fed.Cir. 1993) (explaining the complementary relationship between jurisdiction under the Contract Disputes Act versus broader jurisdictional statutes), *overruled on other grounds by Reflectone,* 60 F.3d 1572. "Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal or action on the claim." 41 U.S.C. § 7103(f)(5).

## B. *The* Maropakis *Decision*

The Federal Circuit in *Maropakis* confronted the issue of whether a contractor could raise as a defense a claim for contract modification, when that claim had not been

the subject of a contracting officer's final decision. The court held that it could not. The case arose out of Maropakis' contract with the government to replace the windows and roof of a Navy warehouse. *Maropakis,* 609 F.3d at 1325. Maropakis completed the contract 467 days late, subjecting the firm to liquidated damages. *Id.* at 1325–26. This assessment instigated a series of letters between the parties, but Maropakis never filed a formal claim. *Id.* at 1326. Six months after Maropakis' last letter, the Navy issued a final decision demanding that Maropakis pay the assessed liquidated damages. *Id.* Just under a year later, Maropakis filed a complaint in this court. *Id.*

Maropakis' complaint first sought damages resulting from the Navy's denial of requested time extensions for completion of the contract. *See M. Maropakis Carpentry, Inc. v. United States,* 84 Fed.Cl. 182, 184 (2008), *aff'd,* 609 F.3d 1323. Second, it contested the Navy's assessment of liquidated damages and sought their rescission. *Id.* at 194. The government counterclaimed for liquidated damages. *Maropakis,* 609 F.3d at 1326. The trial court held that it had no jurisdiction over Maropakis' claim for time extensions because that claim had not been submitted first to a contracting officer as required by the CDA. *Id.* at 1326. The trial court also granted summary judgment to the government on its counterclaim for liquidated damages because Maropakis' sole defense to that counterclaim was its dismissed time-extension claim. *Id.* at 1326–27.

The Federal Circuit affirmed. The court first held that Maropakis' letters, whether considered separately or cumulatively, did not constitute a claim under the CDA. *See Maropakis,* 609 F.3d at 1328–29. Consequently, the trial court was correct to dismiss for lack of jurisdiction Maropakis' claim for time extensions. *Id.* at 1329. The court next addressed Maropakis' argument "that its right to assert a defense against the government's claim for liquidated damages means that the CDA requirements that would otherwise apply to Maropakis'[ ] affir-

---

12. *H.L. Smith* referred to the definition of a claim in 48 C.F.R. § 33.201. That definition was revised slightly and moved to 48 C.F.R. § 2.101 several years later. The subsequent changes did not affect the portion of the definition quoted in *H.L. Smith.*

mative claim for entitlement to time extensions no longer apply and Maropakis can raise these issues to defend against the government's claim." *Maropakis*, 609 F.3d at 1329–30. The Federal Circuit recognized that the trial court properly had jurisdiction over both Maropakis' claim for rescission of liquidated damages and the government's corresponding counterclaim. *Id.* at 1330. However, the court reasoned, "even when used as a defense to a government claim, a contractor's claim for contract modification[, *i.e.*, the claim for a time extension,] must adhere to the jurisdictional requirements of the CDA." *Id.* at 1331 (citing *Sun Eagle Corp. v. United States*, 23 Cl.Ct. 465, 477 (1991); *Elgin Builders, Inc. v. United States*, 10 Cl.Ct. 40, 44 (1986)). The Federal Circuit therefore decided that "the Court of Federal Claims correctly held that it did not have jurisdiction over Maropakis'[ ] claim for time extensions, and because Maropakis'[ ] extension claim was the only defense asserted against the government's counterclaim for liquidated damages, we affirm the grant of summary judgment to the government on its counterclaim for liquidated damages." *Id.* at 1332.[13]

### C. Sikorsky's Second Complaint

██ In light of the decision in *Maropakis*, on August 4, 2010 Sikorsky filed a second claim with its contracting officer limited to its affirmative defenses. On September 29, 2010, the contracting officer declined to issue a final decision on the claim because the officer observed that the claim was already in litigation before this court. Sikorsky challenged the contracting officer's response by filing its second complaint in this court on October 29, 2010, and soon after moved to consolidate that action, No. 10–741C, with its previously filed action, No. 09–844C. On November 19, 2010, the court granted the motion to consolidate. Thereafter, the government moved to dismiss the complaint in No. 10–741 C.

The government contends that *Maropakis* does not apply to Sikorsky's affirmative defenses, *i.e.*, Sikorsky's affirmative defenses

are not separate claims requiring a contracting officer's final decision. Instead, they are aspects of a claim already in litigation before this court, and a contracting officer has no authority to issue a final decision on a claim currently in litigation. Thus, according to the government, the jurisdictional prerequisite of a contracting officer's final decision has not been met for Sikorsky's complaint in No. 10–741 C, so it must be dismissed. Def.'s Mot. to Dismiss at 3–4; *see Sharman*, 2 F.3d at 1571–72; *Roxco, Ltd. v. United States*, 77 Fed.Cl. 138, 149 (2007). Sikorsky responds that, regardless of *Maropakis'* application *vel non*, the contracting officer's response to its second claim should be deemed a final decision. Pl.'s Resp. to Def.'s Mot. to Dismiss at 3–5. Sikorsky also argues that if *Maropakis* does apply to its affirmative defenses, then its affirmative defenses are separate claims that should have been adjudicated by its contracting officer because they were not already in litigation. The officer's failure to do so, therefore, should be deemed a denial of the claim, which can be challenged by a de novo action in this court. *Id.* at 4–5; *see* 41 U.S.C. § 7103(f)(5).

The government's jurisdictional contentions are unavailing. Sikorsky need not be put to the Hobson's choice of preserving its affirmative defenses only through its original complaint or not at all. *Cf. Board of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 840 (Fed.Cir. 2009) ("Rule 8(c)(2) generally favors defendants by construing responsive pleadings liberally to maximize the defendant's available legal theories." (citing *Caldera v. Northrop Worldwide Aircraft Servs.*, 192 F.3d 962, 970 (Fed.Cir.1999))); *City of Gettysburg, S.D. v. United States*, 64 Fed.Cl. 429, 444 (2005). On the assumption that *Maropakis does not* apply to Sikorsky's affirmative defenses, the court would continue to entertain Sikorsky's affirmative defenses as pled in Sikorsky's first complaint. Alternatively, if *Maropakis'* filing requirement *does* apply to Sikorsky's affirmative defenses, then this court manifestly has jurisdiction over Sikorsky's second

---

**13.** Judge Newman dissented, arguing that "[n]o rule or precedent holds that a contractor forfeits its right of defense if it does not file its own claim." *Maropakis*, 609 F.3d at 1334 (Newman, J., dissenting).

complaint (and, again, also over Sikorsky's affirmative defenses).[14]

When a contractor files a claim for more than $100,000 with its contracting officer, the Contract Disputes Act requires the contracting officer to decide the claim within either 60 days or a reasonable time. 41 U.S.C. § 7103(f)(2)-(3). "Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal." *Id.* § 7103(f)(5). If *Maropakis* applies to Sikorsky's affirmative defenses, the contracting officer's choice to decline issuing a final decision on Sikorsky's second set of claims would be incorrect: the claims would not have been already in litigation, so the contracting officer should have issued a final decision within 60 days or a reasonable time. *See Sharman,* 2 F.3d at 1572. The officer's inaction thus would be deemed a denial, and appeal of that denial via the complaint in No. 10–741 C would be jurisdictionally proper. *See Metric Constr.,* 81 Fed.Cl. at 817; *Kit–San–Azusa, J.V. v. United States,* 32 Fed.Cl. 647, 663–64 (1995). If *Maropakis* does not apply, then

Sikorsky's second complaint would be merely redundant.[15] Consequently, on these grounds, the court denies the government's motion to dismiss Sikorsky's complaint in No. 10–741C.

## II. The *In Limine* Motions Concerning the Scope and Thrust of CAS 418

■■■ The government's first motion *in limine* seeks to prevent Sikorsky from introducing any evidence or argument at trial related to 48 C.F.R. § 9904.418–50(e). The second motion *in limine* seeks to prevent Sikorsky from introducing certain categories of accounting data at trial and functions as an adjunct to the first motion. The court's power to consider these motions stems from its "inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984); *see* Fed.R.Evid. 103(c) & advisory committee's note (2000 Amendment). In doing so, the court is not bound by a rigid standard. Instead, review "must proceed on a case-by-case basis." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence Manual* § 2.03[1], at 2–15 (Matthew Bender 3d ed. 2011). In more typical circumstances,

---

**14.** *Maropakis* is distinguishable from the instant case on two grounds. First, *Maropakis*' holding only extends to counterclaim defenses that seek contract modification. *See Maropakis,* 609 F.3d at 1331 ("[A] contractor seeking *an adjustment of contract terms* must meet the jurisdictional requirements and procedural prerequisites of the CDA." (emphasis added)); *id.* ("[E]ven when used as a defense to a government claim, a contractor's claim *for contract modification* must adhere to the jurisdictional requirements of the CDA." (emphasis added)). The *Maropakis* plaintiff sought an extension of time, which is typically considered an equitable adjustment and resolved under doctrines concerning contractual changes. *See, e.g., Travelers Cas. & Sur. of Am. v. United States,* 74 Fed.Cl. 75, 97 (2006) (quoting 48 C.F.R. § 52.246–12(h)); *see also Metric Constr. Co. v. United States,* 81 Fed.Cl. 804, 818 (2008); John Cibinic, Jr., et al., *Administration of Government Contracts* 567–76 (4th ed.2006). By contrast, Sikorsky's affirmative defenses are traditional common law defenses that are independent of the means by which a party seeks equitable adjustment to a government contract.

Second, Maropakis' dismissed claim for a time extension "was the *only* defense asserted against the government's counterclaim for liquidated damages." *Maropakis,* 609 F.3d at 1332 (emphasis added). The time-extension claim could not be used as a sword, so in the procedural setting of that case, neither could it be used as a

shield. *See id.* at 1331; *Sun Eagle,* 23 Cl.Ct. at 474 (Absent presentment to the contracting officer, a contractor's defenses are "limited to the nature of, and the issues present in, the assessment itself," rather than those that could serve as affirmative claims for contract modification.); *Z.A.N. Co. v. United States,* 6 Cl.Ct. 298, 304 (1984) (The finality of a contracting officer's decision "is not [diminished] by any absence of certification by the contractor when it seeks solely to defend against the government's assertion of its claim for liquidated damages. On the other hand, if the contractor further asserts, in addition to its defense of the government's claim, its right to additional relief such as extensions of time and/or money …, then this portion of the dispute may be identified as a claim by the contractor." (internal citation omitted)). Sikorsky's affirmative defenses are not claims for additional relief, nor is Sikorsky in the hapless position of proffering a defense that shares an identity with a dismissed claim.

**15.** The decision whether to strike or dismiss merely redundant pleadings, as contested to jurisdictionally defective pleadings, lies within the trial court's discretion. *See* RCFC 12(f) ("The court *may* strike from a pleading … any redundant … matters." (emphasis added)); *Rates Tech., Inc. v. Nortel Networks Corp.,* 399 F.3d 1302, 1309 n. 6 (Fed.Cir.2005).

motions *in limine* can present "subtle evidentiary questions," *Luce,* 469 U.S. at 41, 105 S.Ct. 460, "before the context of trial has actually been developed," *Stobie Creek Invs., LLC v. United States,* 81 Fed.Cl. 358, 360 (2008) (quoting *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.,* 479 F.3d 1330, 1338 (Fed.Cir.2007)). Ordinarily, when disposing of such motions, this court enjoys broad discretion. *See Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1360–61 (Fed.Cir.2008); *Stobie Creek,* 81 Fed.Cl. at 360. These particular motions, however, raise issues of law engendered by the broad general framework of the case and do not concern evidentiary details. Thus, the court's discretion is constrained.

## A. *Overview*

The central issue in this case is whether Sikorsky's allocation of its materiel overhead pool[16] contravened the requirements of 48 C.F.R. § 9904.418–50. This Section, however, contains two mutually exclusive sets of requirements: one for indirect cost pools containing "a material amount of the costs of management or supervision," *id.* § 9904.418–50(d), and the other for such pools that "do *not* include material amounts of the costs of management or supervision," *id.* § 9904.418–50(e) (emphasis added). The parties disagree as to whether Subsection 418–50(d) or 418–50(e) should apply to Sikorsky's materiel overhead pool. The government's first motion *in limine* seeks to exclude any evidence or argument that Sikorsky's materiel overhead pool complied under Subsection 418–50(e). Instead, the motion argues that as a matter of law Sikorsky's pool can only be evaluated by the standards set out in Subsection 418–50(d). If the government's motion succeeds, then at trial Sikorsky will be restricted to demonstrating that its materiel overhead pool complied with Subsection 418–50(d). If the government's motion fails, then at trial Sikorsky could seek to demonstrate that its overhead pool complied with Subsec-

tion 418–50(e) or, in the alternative, with Subsection 418–50(d).

The key portions of the regulation read as follows:

(d) *Allocation measures for an indirect cost pool which includes a material amount of the costs of management or supervision of activities involving direct labor or direct materi[e]l costs.*

(1) The costs of the management or supervision of activities involving direct labor or direct materi[e]l costs do not have a direct and definitive relationship to the benefiting cost objectives and cannot be allocated on measures of a specific beneficial or causal relationship. In that circumstance, the base selected to measure the allocation of the pooled costs to cost objectives shall be a base representative of the activity being managed or supervised.

(2) The base used to represent the activity being managed or supervised shall be determined by the application of the criteria below. All significant elements of the selected base shall be included.

(i) A direct labor hour base or direct labor cost base shall be used, whichever in the aggregate is more likely to vary in proportion to the costs included in the cost pool being allocated, except that:

(ii) A machine-hour base is appropriate if the costs in the cost pool are comprised predominantly of facility-related costs, such as depreciation, maintenance, and utilities; or

(iii) A units-of-production base is appropriate if there is common production of comparable units; or

(iv) A materi[e]l cost base is appropriate if the activity being managed or supervised is a materi[e]l-related activity. . . .

(e) *Allocation measures for indirect cost pools that do not include material*

---

16. The term Sikorsky used for its indirect cost pool was, beginning in 1999, its "materi[e]l operations" pool. *See* Pl.'s Surreply to Def.'s Motion *in Limine* Concerning CAS 418–50(e) ("Pl.'s Surreply") at 6–7. That pool collected materiel overhead costs. *Id.* This intermediate cost pool

was then allocated to various manufacturing pools, which were in turn allocated to cost objectives. *See id.* at 7. For clarity, the court refers to Sikorsky's "material operations" pool as the materiel overhead pool.

*amounts of the costs of management or supervision of activities involving direct labor or direct materi[e]l costs.* Homogeneous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefiting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be made in accordance with the following criteria taking into consideration the individual circumstances:

  (1) The best representation of the beneficial or causal relationship between an indirect cost pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool.

  (2)(i) If consumption measures are unavailable or impractical to ascertain, the next best representation of the beneficial or causal relationship for allocation is a measure of the output of the activities of the indirect cost pool. Thus, the output is substituted for a direct measure of the consumption of resources.

  (ii) The use of the basic unit of output will not reflect the proportional consumption of resources in circumstances in which the level of resource consumption varies among the units of output produced. Where a materi[e]l difference will result, either the output measure shall be modified or more than one output measure shall be used to reflect the resources consumed to perform the activity.

  (3) If neither resources consumed nor output of the activities can be measured practically, a surrogate that varies in proportion to the services received shall be used to measure the resources consumed. Generally, such surrogates measure the activity of the cost objectives receiving the service.

48 C.F.R. § 9904.418–50(d) to (e).

Sikorsky contends that the key to whether Subsection 418–50(d) or 418–50(e) applies to a pool is whether that pool includes "a mate-

rial amount of the costs of management or supervision." 48 C.F.R. § 9904.418–50(d); *see* Pl.'s Surreply at 12–14. Thus, in Sikorsky's view, pools containing significant management or supervision costs, as a quantitative measure, are governed by Subsection 418–50(d), and those that do not are governed by Subsection 418–50(e). Pl.'s Surreply at 12–14.

In contrast, the government argues that the key to determining whether Subsection 418–50(d) or 418–50(e) applies to a pool turns on the phrase that follows "material amounts of the costs of management or supervision," *i.e., "activities involving direct labor or direct materi[e]l costs."* 48 C.F.R. § 9904.418–50(d) (emphasis added); *see* Def.'s Supplemental Br. in Resp. to Pl.'s Sur–Reply ("Def.'s Supp. Br.") at 5–6. The government avers that the CASB was not concerned with whether indirect pools contained management costs, but whether they collected costs of *activities* "hav[ing] a direct and definitive relationship . . . [to] benefiting cost objectives." 48 C.F.R. § 9904.418–50(e); *see* Def.'s Supp. Br. at 7–9; Def.'s Reply to Pl.'s Resp. to Def.'s Mot. *in Limine* to Exclude Evidence & Arg. Concerning Cost Accounting Standards 418–50(e) ("Def.'s Reply (re CAS 418)") at 102.

This interpretation of Subsections 418–50(d) and (e) serves as the textual touchstone for the government's chief argument: the government posits that Subsection 418–50(d) sets out the allocation rules for indirect cost pools collecting overhead costs, which costs have a tenuous relationship to cost objectives, while Subsection 418–50(e) sets out the allocation rules for indirect cost pools collecting costs of service centers, which are more directly attributable to cost objectives. *See, e.g.,* Hr'g Tr. at 20:14 to 22:12, 35:17 to 36:12 (Sept. 27, 2011); Def.'s Reply (re CAS 418) at 2, 4–5, 102–04; Def.'s Supp. Br. at 9, 36–37. As the government would have it, pools containing management costs are entirely governed by another Cost Accounting Standard, *viz.,* 48 C.F.R. § 9904.410 ("CAS 410"). *See* Def.'s Supp. Br. at 24–25 & n. 8, 35.[17]

17. CAS 410 is captioned "Allocation of business unit general and administrative expenses to final cost objectives" and consists of Sections 9904.410–20 to 9904.410–63.

The government also contends that the regulatory history of CAS 418 demonstrates the CASB's intent to establish a separation between overhead pools and service center pools, not to differentiate between pools depending on whether they contain material amounts of the costs of management or supervision. *See* Hr'g Tr. at 49:20 to 50:24, 52:1–5 (Sept. 27, 2011); Def.'s Supp. Br. at 26–37; Def.'s Reply (re CAS 418) at 2–5, 101. Therefore, reasons the government, because overhead pools fall strictly under Subsection 418–50(d), and because Sikorsky's materiel overhead pool is an overhead pool,[18] the factual inquiries at trial should be limited to whether Sikorsky's pool complied with Subsection 418–50(d).

### B. *Plain Meaning*

■ To determine whether Subsection 418–50(d) governs Sikorsky's materiel overhead pool as a matter of law, the court must "ascertain the CASB's intended meaning when it promulgated the CAS." *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995). This task "begin[s], as [it] must, with the plain language of the regulation." *Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed.Cir.1986) (citing *General Elec. Co. v. United States*, 610 F.2d 730, 734 (Ct.Cl. 1979)). "When the [regulation's] language is plain, the sole function of the courts ... is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)). Only in the face of a manifest scrivener's mistake in preparation of regulatory text or "a clearly expressed ... intention to the contrary," *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980), may the court consider an argument that the CASB "did not intend words of common meaning to have their literal effect," *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (citing *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892)).

■ The plain language of Subsections 418–50(d) and 418–50(e) demarcates indirect cost pools based on two criteria: first, whether the pools contain significant management or supervision costs, and second, whether the activity being managed or supervised involves direct labor or direct materiel costs. Thus, Subsection 418–50(d) applies only to "an indirect cost pool which includes [1] a material amount of the costs of management or supervision [2] of activities involving direct labor or direct materi[e]l costs." 48 C.F.R. § 9904.418–50(d) (bracketed numbers added). Conversely, Subsection 418–50(e) applies to "indirect cost pools [1] *that do not include* material amounts of the costs of management or supervision [2] of activities involving direct labor or direct materi[e]l costs." *Id.* § 9904.418–50(e) (bracketed numbers added) (emphasis added). In short, both types of indirect cost pools use the words "activities involving direct labor or direct materi[e]l costs." *Id.* §§ 9904.418–50(d), (e). Nonetheless, not all of the costs in an indirect cost pool may involve direct labor or direct materiel costs, and this circumstance may vary somewhat depending upon which Subsection is involved.[19] Rather, the Subsections are primarily differentiated based upon whether the indirect cost pools involved contain significant amounts of management and supervision costs.

Besides indirect costs related to direct labor or direct materiel costs, the indirect cost pools may also include indirect costs of other indirect costs. For example, an illustration in Subsection 418–60(e) addresses allocating an occupancy-cost pool on the basis of square footage. Although all of the costs in the pool are indirect costs, some of the costs of the occupancy-cost pool may relate to direct activities such as warehousing and factory occupancy, but some may reflect indirect activities such as office occupancy costs.

---

18. Sikorsky disputes this premise of the government's syllogism. It argues that, even if the government's interpretation of CAS 418 is correct, its materiel overhead pool should be considered a service center pool, not an overhead pool. *See* Pl.'s Surreply at 37–39.

19. In both Subsections, the phrase "costs of management or supervision" modifies the phrase "an indirect cost pool." In turn, the phrase "of activities involving direct labor or direct materi[e]l costs" modifies the phrase "costs of management or supervision."

■ The regulation defines neither "management" nor "supervision." Consequently, they "will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975)); *see Rumsfeld*, 315 F.3d at 1370 (applying "standard dictionary definitions and other pertinent regulations" to determine the meaning of undefined CAS terms); *ATK Thiokol, Inc. v. United States*, 68 Fed.Cl. 612, 630–31 (2005). The word "management" is a nominal of the verb "manage," which means "[t]o direct or control the use of; ... [t]o exert control over; ... [t]o direct or administer (the affairs of an organization, estate, household, or business)." *American Heritage Dictionary of the English Language* 792 (New Coll. ed. 1976). Correlatively, the noun "supervision" stems from the verb "supervise," which means "[t]o direct and inspect the performance of (workers or work); oversee; superintend." *Id.* at 1292; *see also Random House College Dictionary* 811, 1320 (rev. 1st ed. 1975); *Webster's Third New International Dictionary* 1372, 2296 (16th ed. 1971).[20] The words have no special meaning for accountants or auditors. *See* Erik Banks, *Palgrave Macmillan Dictionary of Finance, Investment and Banking* 317–19 (2010) (no entry for "management"); *id.* at 496–97 (no entry for "supervision"); David O'Regan, *Auditor's Dictionary* 176–78, 250 (2004) ("management" defined as "[t]he process of directing, controlling, and planning in an organization" and "supervision" defined as "[t]he oversight, review, and correction of a matter," *id.* at 250); *Oxford Dictionary of Accounting* 272–73, 404 (4th ed. 2010) (no entry for "management" or "supervision"); Joel G. Siegel & Jae K. Shim, *Dictionary of Accounting Terms* 269–72, 429 (3d ed. 2000) (same).

Other Cost Accounting Standards use the terms "management" and "supervision" according to their plain meanings. *See Guerra v. Shinseki*, 642 F.3d 1046, 1052–53 (Fed.Cir. 2011) ("[I]dentical words used in different parts of the same [regulation] are generally presumed to have the same meaning." (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005))). CAS 410 refers repeatedly to "management and administration of the business unit as a whole." *E.g.*, 48 C.F.R. § 9904.410–20. CAS 410 also refers to costs related to "[l]ine management," *id.* § 9904.410–50(g)(1)(i),[21] and "staff management," *e.g., id.* § 9904.410–50(g)(2),[22] which are two particular kinds of management as that word is used in its typical sense. Likewise, CAS 403 states that "[t]he expense of line management shall be allocated only to the particular segment or group of segments which are being *managed or supervised....* Line management is considered to consist of *management or supervision* of a segment or group of segments as a whole." *Id.* § 9904.403–40(b)(3) (emphases added). Finally, CAS 420 uses the terms to describe the functions of a contractor's home office: "Home office means an office responsible for *directing or managing* ... segments of an organization. *It typically establishes policy for, and provides guidance to the segments in their operations.* It usually performs *management, supervisory, or administrative functions.*" *Id.* § 9904.420–30(a)(5) (emphases added).

This plain language refutes the government's contention that the phrase "management or supervision of activities involving direct labor or direct materi[e]l costs" denotes the concept of an overhead cost pool for Subsection 418–50(d) and the same language refers specifically to service-center pools for Subsection 418–50(e). Had the CASB "intended for [these subsections] to carry a specialized—and indeed, unusual—

---

20. These dictionaries were published near the time of the CASB's consideration of the regulatory text in the late 1970s and the adoption of the text in 1980.

21. Line management "consists of line managers with responsibility for deciding the policy of and running the organization's main activities (such as manufacturing, sales, etc.)." *Oxford Dictio-*

*nary of Business and Management* 333 (5th ed. 2009).

22. Staff management consists of "staff managers, [who] are responsible for providing such supporting services as warehousing, accounting, transport, personnel management, and plant maintenance." *Oxford Dictionary of Business and Management* 333.

meaning ..., [the CASB] would have said so expressly." *Hamilton v. Lanning,* —— U.S. ——, ——, 130 S.Ct. 2464, 2474, 177 L.Ed.2d 23 (2010); *see also Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 469, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring in the judgment) ("Reluctance to working with the basic meaning of words in a normal manner undermines the legal process."); *cf. Perry,* 47 F.3d at 1138 (There is "no reason to believe the CASB would publish incomplete, and possibly misleading, illustrations."). Section 418–50 does not mention overhead, service center, or other particular kinds of indirect cost pools. Instead, the language only refers to indirect cost pools generally, differentiating them insofar as they encompass "management or supervision of activities involving direct labor or direct materi[e]l costs." 48 C.F.R. §§ 9904.418–50(d), (e).

Unlike the terms "management" and "supervision," the term "material," as in "material amounts of the costs of management or supervision," is defined by another regulation promulgated by CASB, which states:

In determining whether amounts of cost are material or immaterial, the following criteria shall be considered where appropriate; no one criterion is necessarily determinative:

(a) The absolute dollar amount involved. The larger the dollar amount, the more likely that it will be material.

(b) The amount of contract cost compared with the amount under consideration. The larger the proportion of the amount under consideration to contract cost, the more likely it is to be material.

(c) The relationship between a cost item and a cost objective. Direct cost items, especially if the amounts are themselves part of a base for allocation of indirect costs, will normally have more impact than the same amount of indirect costs.

(d) The impact on [g]overnment funding. Changes in accounting treatment will have more impact if they influence the distribution of costs between [g]overnment and non-[g]overnment cost objectives than if all cost objectives have [g]overnment financial support.

(e) The cumulative impact of individually immaterial items. It is appropriate to consider whether such impacts:

(1) Tend to offset one another, or

(2) Tend to be in the same direction and hence to accumulate into a material amount.

(f) The cost of administrative processing of the price adjustment modification shall be considered. If the cost to process exceeds the amount to be recovered, it is less likely the amount will be material.

48 C.F.R. § 9903.305. This definitional regulation applies to CAS 418. *See* 48 C.F.R. § 9904.418–50(b)(2) ("The determination of materiality shall be made using the criteria provided in 9903.305."); *id.* § 9904.418–50(c) (same); *see also id.* §§ 9904.418–30(a), (b). Therefore, for purposes of CAS 418, the criteria in Section 9903.305 that are "appropriate," should be used to measure the materiality of management-related costs in indirect cost pools. *See Sierra Club v. Clark,* 755 F.2d 608, 613 (8th Cir.1985) ("[D]efinitions of words used elsewhere in the same [regulation] furnish such authoritative evidence of [regulatory] intent and meaning that they are usually given controlling effect." (citing *Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947))).

### C. *The Regulatory Scheme*

The plain language of the triggering portions of Subsections 418–50(d) and (e) admit only one interpretation. Even so, the court must ensure that the interpretation is not manifestly mistaken in light of the regulatory context. *See Sterling Fed. Sys., Inc. v. Goldin,* 16 F.3d 1177 (Fed.Cir.1994); *see also Allegheny Teledyne Inc. v. United States,* 316 F.3d 1366, 1374–75 (Fed.Cir.2003) (dismissing plain language arguments that "would frustrate the undeniable purpose of [a CAS] provision," *id.* at 1374). The stated purpose of this portion of the CAS is "to provide for consistent determination of direct and indirect costs; to provide criteria for the *accumulation of indirect costs, including service center and overhead costs, in indirect cost pools;* and, to provide guidance relating to the selection of allocation measures based

on the beneficial or causal relationship between an indirect cost pool and cost objectives." 48 C.F.R. § 9904.418-20 (emphasis added). The second clause of the statement refers to both service center and overhead costs, but it does so in a way that suggests they should be grouped together, not separately. In this respect, the third clause states that *all* indirect cost pools should be allocated "based on [their] beneficial or causal relationship [to] ... cost objectives."

Other portions of CAS 418 elaborate on these relationships. Section 418-40 explains that pools with significant management costs have a more attenuated causal relationship to cost objectives than do pools without significant management costs. "If a material amount of the costs included in a cost pool are costs of management or supervision of activities involving direct labor or direct materi[e]l costs, resource consumption cannot be specifically identified with cost objectives." 48 C.F.R. § 9904.418-40(c)(1). This is because, as Sikorsky observes, "[t]he costs of managing or supervising activities of employees whose own work involves various contracts are further removed from the benefiting contracts. As a result, indirect cost pools that include significant management or supervision costs 'cannot be allocated on measures of a specific beneficial or causal relationship.'" Pl.'s Surreply at 13 (quoting 48 C.F.R. § 9904.418-50(d)(1)). Therefore, "in that circumstance, a base [is] used which is representative of the activity being managed or supervised," *i.e.*, a base among the alternatives provided by Subsection 418-50(d). 48 C.F.R. § 9904.418-40(c)(1).

Conversely, if a "cost pool does not contain a material amount of the costs of management or supervision of activities involving direct labor or direct materi[e]l costs, resource consumption can be specifically identified with cost objectives." 48 C.F.R. § 9904.418-40(c)(2). This is because the pool's activities are more directly associated with cost objectives. Consequently, the pool's costs can be allocated more precisely, *i.e.*, "[t]he pooled cost [can] be allocated based on the specific identifiability of resource consumption with cost objectives ... in accordance with the criteria set out in 9904.418-50(e)." *Id.* The regulation's illustrations bear out this analysis. *See id.* § 9904.418-60(e) (commenting that a weighted-square-foot basis for allocating occupancy costs "adequately reflect[s] the proportional consumption of resources," as required by Subsection 418-50(e)); *id.* § 9904.418-60(f) (noting that a dollars-of-materiel-issued basis for allocating the costs of a materiel-related overhead pool "varies in proportion to the services rendered," as required by Subsection 418-50(e)).

The government questions this understanding of the regulations. In its effort to define Subsection 418-50(d) as applying to overhead pools rather than to pools with significant, *i.e.*, "material," costs of management and supervision, the government contends that *all* management and supervision pools are instead governed by an entirely different portion of the Cost Accounting Standards, namely, CAS 410. Def.'s Supp. Br. at 24-25 & n. 8, 35 (referring to 48 C.F.R. §§ 9904.410-20 to -63).

The government confuses the operation of CAS 410, which allocates general, overarching costs of management, with the operation of Subsection 418-50(d), which concerns inclusion in an indirect cost pool of costs of management related to direct-cost activities. The stated purpose of CAS 410 "is to provide criteria for the allocation of business unit general and administrative (G & A) expenses to business unit final cost objectives based on their beneficial or causal relationship." 48 C.F.R. § 9904.410-20. CAS 410 defines "general and administrative expense" as "any management, financial, and other expense which is incurred by or allocated to a business unit and which is for the general management and administration *of the business unit as a whole*." *Id.* § 9904.410-30(a)(6) (emphasis added). Tellingly, the definition continues with an explicit exclusion that bears on the issue at hand, *i.e.*, "G & A expense *does not include* those management expenses whose beneficial or causal relationship to cost objectives *can be more directly measured by a base other than a cost input base representing the total activity of a business unit* during a cost accounting period." *Id.* (emphases added). The indirect cost

pools embraced by Subsection 418–50(d) are those containing "material" management or supervisory costs of "activities involving direct labor or direct materi[e]l costs," *id.* § 9904.418–50(d), not those "of the business unit as a whole," *id.* § 9904.410–30(a)(6). Such direct-cost activities are more narrow and thus "can be more directly measured by a base other than a cost input base representing the total activity of a business unit." *Id.* These bases are set out in Subsection 418–50(d)(2).[23]

### D. Regulatory History

1. *The universe of salient regulatory history.*

■ The regulation's text and purpose are relatively quite plain upon close examination. To counter this plain meaning, the government resorts to regulatory history. The government has a heavy burden in this regard. "When text and legislative history disagree, the text controls." *Stromberg Metal Works, Inc. v. Press Mech., Inc.,* 77 F.3d 928, 931 (7th Cir.1996) (Easterbrook, J.) (citing *In re Sinclair,* 870 F.2d 1340 (7th Cir. 1989)).

At the outset, the parties dispute the universe of sources of regulatory history the court may consider. The government urges the court to entertain its prolix arguments based on records of the CASB's work stored at the National Archives. *See* Def.'s Reply (re CAS 418) at 2–96; Def.'s Supp. Br. at 31–32, 34, 36–52; *see also* Def.'s Reply (re CAS 418) app., ECF nos. 94–106 (2,316–page appendix). Sikorsky argues that the court may not rely upon such "unpublished materials." Pl.'s Surreply at 23–24.

The Federal Circuit has counseled this court to exercise caution when considering wide-ranging materials associated with development of regulations. In *Perry,* 47 F.3d 1134, the Federal Circuit determined the meaning of a Cost Accounting Standard by relying on its accompanying illustrations and preamble, reasoning that the materials were "guidance the CASB ha[d] published to aid in interpretation." *Id.* at 1137. Later, in *Allegheny Teledyne,* the Federal Circuit gave no weight to a CASB staffer's explanatory memoranda when interpreting a Cost Accounting Standard because the memoranda "were not published by the Board to aid the interpretation of [the CAS,] ... the statements ... [were] not statements by the Board, they [were] vague, and they were written at least nine months after the promulgation of [the CAS in question]." 316 F.3d at 1377; *cf. United States v. Casson,* 434 F.2d 415, 422 (D.C.Cir.1970) ("[T]he public are charged with knowledge of all the *published* information concerning a congressional bill that is available during the entire legislative process." (emphasis added)).

Accordingly, *Perry* and *Allegheny Teledyne* counsel this court to forbear reference to the government's proffered records. In particular, three of the four factors cited in *Allegheny Teledyne* weigh against giving any serious consideration to the records. Granted, the records were likely created prior to the regulation's promulgation. *But see* Def.'s Reply (re CAS 418) at 44 ("From various clues, counsel estimates the date of the brainstorming memorandum as March 1979."). Nonetheless, the records were not "published by the Board to aid interpretation;" to the contrary, the "materials are not easy to access, and it is cumbersome and time-consuming to make copies of any pages." Def.'s Unopposed Mot. for Enlargement of Time, Mar. 9, 2011, ECF No. 75. Likewise, the records are not statements by the Board; instead, they are a hodgepodge of meeting minutes, staffers' notes, draft regulations, reports, hearings, and technical papers, many of which are anonymous. *See, e.g.,* Def.'s Reply (re CAS 418) at 31–32 (citing an "unsigned record"); *id.* at 44 (referring to an unsigned and undated memorandum); *id.* at 94 (noting an audio transcript without clearly identified speakers).

---

**23.** Under the regulations, CAS 410 is reserved for indirect cost pools containing management or supervision costs that *do not* correlate to direct labor or direct materiel costs. Because pools of this nature are further removed from final cost objectives than pools containing costs of management or supervision of direct-cost activities, they cannot "be more directly measured by a base other than a cost input base representing the total activity of a business unit." 48 C.F.R. § 9904.410–30(a)(6). Consequently, the proper allocation bases for those pools are found in CAS 410, not in CAS 418. *See id.* § 9904.410–40(d).

Finally, the records are vague and unreliable. *See, e.g., id.* at 44 ("[T]he available records suggest that many ideas floated were abandoned before the recommendation[s] to the CAS Board were submitted."); *id.* at 50 ("Either the recollection was inaccurate, the CAS Board changed its mind, or the idea was simply ignored and abandoned."); *id.* at 93 ("It is possible that ... the draft attached to the cover note in the archive file was mistaken."). The court is not assisted by references to such documents, and litigants should not be encouraged to embark upon expeditions to search for them.

### 2. *The published regulatory history.*

The published regulatory history, by contrast, is reassuring. Indeed, "[t]o the extent any doubt remains about [the CASB's] intent, the [regulatory] history confirms what the plain text strongly suggests." *Boumediene v. Bush,* 553 U.S. 723, 778, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); *see also IPSCO, Inc. v. United States,* 965 F.2d 1056, 1060 (Fed.Cir.1992). This history consists of five publications in the *Federal Register:* (1) the CASB's 1973 statement of its principles; (2) the CASB's 1977 restatement of those principles; (3) a first draft of CAS 418, published in 1978; (4) a second draft of CAS 418, published in 1979; and (5) the preamble to the final version of CAS 418, published in 1980.

While the various predecessors of CAS 418 vary in the number and contours of indirect cost pools required of contractors, each permutation nonetheless preserves a hierarchy of four bases for allocating indirect cost pools. This hierarchy demonstrates the CASB's intent to divide indirect cost pools based on their relationship to benefitting cost objectives and to judge the inclusion, or not, of costs of management or supervision in that way. As set out in the CASB's 1977 restatement of principles:

> Where units of resources used are not directly identified with final cost objectives, the cost of such resources should be grouped into logical and homogeneous pools for allocation to cost objectives in accordance with a hierarchy of preferable techniques....

> 1. The preferred representation of the relationship between the pooled cost and the benefiting cost objective is a measure of the activity (input) of the function or functions represented by the pool of cost. *This relationship can be measured in circumstances where there is a direct and definitive relationship between the function or functions and the benefiting cost objectives....*

> 2. Where such measures are unavailable or impractical to ascertain[,] the basis for allocation can be a measurement of the output of the function or functions represented by the pool of cost....

> 3. Where neither activity (input) nor output of the functions can be measured practically, a surrogate must be used to measure the resources used....

> 4. *Pooled costs which cannot readily be allocated on measures of specific beneficial or causal relationship generally represent the cost of overall management activities. Such costs do not have a direct and definitive relationship to the benefiting cost objectives.* These costs should be grouped in relation to the activities managed and the base selected to measure the allocation of these indirect costs to cost objectives should be a base representative of the entire activity being managed. For example, the total cost of plant activities managed might be a reasonable base for allocation of general plant indirect costs. *The use of a portion of a total activity, such as direct labor costs or direct materi[e]l costs only, as a substitute for a total activity base, is acceptable only if the base is a good representation of the total activity being managed.*

Restatement of Objectives, Policies and Concepts, 42 Fed.Reg. 25,751, 25,752 (May 19, 1977) ("1977 Restatement") (emphases added); *see also* Cost Accounting Standards; Statement of Operating Policies, Procedures, and Objectives, 38 Fed.Reg. 6122, 6124 (Mar. 6, 1973) (same). The first three bases—for activities that have "a direct and definitive relationship between the ... functions and the benefiting cost objectives"—are the same three bases set out in 48 C.F.R. § 9904.418–50(e)(1) to (3). The fourth base—for man-

agement activities which "do not have a direct and definitive relationship to the benefiting cost objectives"—is the same as that set out in 48 C.F.R. § 9904.418–50(d).

The 1978 draft of CAS 418 manifests the CASB's concern for separating management costs. The draft contained five proposed Cost Accounting Standards, namely, "Distinguishing Between Direct and Indirect Costs," "Allocation of Service Center Costs," "Allocation of Materi[e]l–Related Overhead Costs," "Allocation of Manufacturing ... Overhead Costs," and "Allocation of [Other] Indirect Costs." Cost Accounting Standards; Indirect Cost Allocation, 43 Fed.Reg. 11,118, 11,-118 (proposed Mar. 16, 1978). For each category of indirect costs, the corresponding standard set out a series of acceptable allocation methods. *See id.* at 11,120, 11,122–24, 11,127. Materiel-related and manufacturing overhead cost pools were to be allocated by various activity-related measures. Service center cost pools were to be allocated only by the first three bases set out in the four-base allocation hierarchy. Other indirect cost pools were to be allocated by all four bases set out in the hierarchy. The fourth base was necessary for these other pools, but not for service center pools because, according to the CASB, "[i]ndirect cost pools which cannot readily be allocated on measures of specific beneficial or causal relationship generally represent the cost of overall management activities. Such costs do not have a direct and definitive relationship to the benefiting cost objectives." *Id.* at 11,127.

The 1979 draft continued to distinguish pools containing management costs related to direct-cost activities. The standards for materiel-related and manufacturing overhead pools were merged into one standard titled "Allocation of Overhead Costs of Productive Functions and Activities." *See* Cost Accounting Standards; Indirect Cost Allocation, 44 Fed.Reg. 42,988 (proposed July 23, 1979) ("1979 Draft"); *see id.* at 42,990 ("Materi[e]l-related overhead costs can be dealt with in the same Standard dealing with other overhead costs of productive functions and activities."). Similarly, the standards for allocating service center pools and other indirect cost pools were merged into one standard titled "Allocation of Indirect Cost Pools." *Id.* at 42,989; *see id.* at 42,990 ("[T]here is no need to deal with the term service center since the concept of service center is within the scope of the term 'indirect cost pool.'"). The 1979 draft further explained that all indirect cost pools, including overhead pools, should be subject to the four-base hierarchy unless specifically excepted. "Indirect cost pools are either productive (e.g., process cost center) pools, service (e.g., service center) pools, overhead pools[,] or general and administrative (G & A) cost pools. Costs are allocated from these cost pools in accordance with the hierarchy of allocation base preferences ... [unless] allocation is provided for in any other [c]ost accounting standard." 1979 Draft at 42,989–90. In the 1979 draft, overhead pools were governed by another Cost Accounting Standard, thus excluding them from the four-base hierarchy. *See id.* at 42,993 ("Indirect costs which are overhead costs of productive functions or productive activities shall be allocated to final cost objectives according to [other] provisions.").

Notably, this separate treatment of overhead pools was eliminated in the final version of the rule. The CASB "determined that it is appropriate to reduce the degree of specificity contained in the [1979 draft]. As a consequence, the Board has been able to consolidate the three proposed Standards into the one Standard being promulgated today." Allocation of Direct and Indirect Costs; Cost Accounting Standard, 45 Fed. Reg. 31,929, pmbl. at 31,929 (May 15, 1980) ("CAS 418 Preamble"). The proposed separate standards for overhead pools were subsumed under the generally applicable four-base hierarchy, referenced as "the basic concepts of cost allocation previously established in the Board's [1977] *Restatement*":

A large number of commentators were also critical of the proposed CAS 419 [the standard governing overhead pools in the 1979 draft] because in their opinion it provided too great a degree of specificity. The requirements relative to separate overhead pools ... were considered by many commentators to be too procedural and detailed.

The Board was of the opinion that some degree of specificity would be desirable and necessary in this area to minimize differing interpretations by the contracting parties. *In light of the number of criticisms on the specificity of the proposed CAS 419, however, the Board decided to remove the references to those terms and provisions.* The elimination of these terms and provisions does not reflect a change in position concerning the appropriate accounting for the costs involved. Rather, *in consolidating the proposed 417, 418 and 419 into a single CAS 418 being promulgated today, the Board is providing a more general Standard incorporating the basic concepts of cost allocation previously established in the Board's Restatement of Objectives, Policies and Concepts.*

*Id.* at 31,931–32 (emphases added). As already discussed, CAS 418 plainly implements the hierarchy set out in the 1977 Restatement. Compare 1977 Restatement at 25,752, with 48 C.F.R. §§ 9904.418–50(d)(1), (e)(1)–(3).

Accordingly, in line with the 1977 Restatement, the CASB continued to state its intent to separate pools containing significant management costs. As explained in the preamble:

A number of commentators questioned when the fourth step of the hierarchy in the proposed CAS 418 [ (the 1979 proposed standard governing indirect cost pools) ], a base representative of the activity being managed or supervised, was to be used. *The Standard has been revised to provide more clearly that this type of base is to be used only to allocate indirect cost pools containing significant amounts of the costs of management or supervision of activities involving direct labor or direct materi[e]l cost . . . .* Therefore these cost pools are those which include the costs of managing and supervising final cost objectives. . . . *A base representative of the activity being managed or supervised is not suitable for the allocation of the costs of management or supervision of activities involving only indirect costs.*

For emphasis, the fourth step of the hierarchy has been set forth in a paragraph, § 418.50(d), separate and apart from the first three steps of the hierarchy (§ 418.50(e)) which should be used for allocating other indirect cost pools such as service centers.

CAS 418 Preamble at 31,931 (emphases added). This explanation confirms the court's plain-meaning interpretation of CAS 418. Indirect cost pools, including—but not limited to—service centers, fall under Subsection 418–50(e), except for those pools "containing significant amounts of the costs of management or supervision of activities involving direct labor or direct materi[e]l cost." CAS 418 Preamble at 31,931. Those pools fall under Subsection 418–50(d), with a base selected that is "representative of the activity being managed or supervised." 48 C.F.R. § 9904.418–50(d)(1). Meanwhile, pools containing significant costs of management over "activities involving only indirect costs" are not governed by either Subsection 418–50(d) or (e), because "[a] base representative of the activity being managed or supervised[, *i.e.*, one of the bases set out in Subsection 418–50(d),] is not suitable," CAS 418 Preamble at 31,931. Instead, these pools are governed by CAS 410. *See* 48 C.F.R. § 9904.410–30(a)(6).

### E. Synopsis

The plain language of 48 C.F.R. §§ 9904.418–50(d) and (e) divides indirect cost pools by inclusion, or not, of significant costs of management or supervision of activities related to direct labor or materiel costs. Pools containing such significant costs are governed by Subsection 418–50(d); pools without such costs are governed by Subsection 418–50(e). This interpretation is supported by the regulation's overall operation and purpose, and by the relevant regulatory history. Consequently, whether Sikorsky's materiel overhead pool falls under Subsection 418–50(d) or under Subsection 418–50(e) turns on whether the pool contained significant costs of management or supervision of direct-cost activities. This is a question of fact to be determined at trial. Therefore, the government's first motion *in limine* is denied.

The government's second motion *in limine* seeks to prohibit Sikorsky from introducing

at trial any accounting data beyond that already disclosed in a certain discovery response. Given the court's determination that Sikorsky's accounting data is relevant to the resolution of this case, and given the premature nature of this request, this second motion *in limine* must also be denied.

### III. Disputed Interrogatories

■ The government's final motion seeks leave to serve interrogatories beyond the 25 allowed by RCFC 33(a)(1). "[B]ecause [interrogatories] can be costly and may be used as a means of harassment, it is desirable to subject [their] use to the control of the court consistent with the principles stated in [RCFC] 26(b)(2).... The aim is not to prevent needed discovery, but to provide judicial scrutiny before parties make potentially excessive use of this discovery device." Fed. R.Civ.P. 33 advisory committee's notes (1993 Amendments).[24] RCFC 26(b)(2) specifies that "the court must limit the frequency or extent of discovery otherwise allowed ... [if] the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case ... and the importance of the discovery in resolving the issues [at stake in the action]." RCFC 26(b)(2)(C), 26(b)(2)(C)(iii). This weighing of burden and benefit, like all "[q]uestions of the scope and conduct of discovery[, is] committed to the discretion of the trial court." *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed.Cir.1984) (citing *Marroquin–Manriquez v. INS*, 699 F.2d 129, 134 (3d Cir.1983)); *see Duncan v. Paragon Publ'g, Inc.*, 204 F.R.D. 127, 128 (S.D.Ind.2001).

■ The government's additional interrogatories are formulated as a series of accounting calculations that the government wishes Sikorsky to perform. *See* Def.'s Mot. for Leave to Serve Interrogs. The calculations would illuminate the difference in costs, if any, allocated to government contracts depending on the method used to allocate those costs. From 1999 to 2005, Sikorsky allocated its materiel overhead pool to its manufacturing overhead pool, and the combined pool was allocated to government contracts by a direct-labor-dollar base. *Id.* at 3–4; Pl.'s Surreply at 6–7. The government's interrogatories ask how the costs allocated to government contracts would have changed had Sikorsky instead used a materiel overhead base or a materiel cost base to allocate the costs of the materiel overhead pool. *See* Def.'s Mot. for Leave to Serve Interrogs. at 3–4, app. at 25–27.

Such changes in cost allocations, if they exist, matter because indirect cost pools must be homogeneous. Specifically, every indirect cost pool must only contain costs (1) that share the same or a similar relationship to cost objectives, or (2) that would not result in a materially different allocation to cost objectives if the costs were allocated separately. *See* 48 C.F.R. § 9904.418–50(b).[25] By requesting a comparison of costs based on separate and different allocations of the materiel overhead pool, the government's interrogatories seek to determine whether Sikorsky's manufacturing overhead pool violated the test's second prong, *i.e.*, whether a separa-

---

**24.** Save for the use of the word "Rule" instead of the abbreviation "RCFC," Fed.R.Civ.P. 33 is identical to RCFC 33. The court may apply interpretations of the federal rule by analogy. *See, e.g., Wheeler v. United States*, 11 F.3d 156, 157 n. 1 (Fed.Cir.1993); *Estate of Rubinstein v. United States*, 96 Fed.Cl. 640, 645 n. 3 (2011); *Renda Marine, Inc. v. United States*, 58 Fed.Cl. 57, 63 n. 9 (2003).

**25.** The full text of the relevant CAS provisions reads as follows:

Indirect costs shall be accumulated in indirect cost pools which are homogeneous.

....

(1) An indirect cost pool is homogeneous if each significant activity whose costs are included therein has the same or a similar

beneficial or causal relationship to cost objectives as the other activities whose costs are included in the cost pool. It is also homogeneous if the allocation of the costs of the activities included in the cost pool result in an allocation to cost objectives which is not materially different from the allocation that would result if the costs of the activities were allocated separately.

(2) An indirect cost pool is not homogeneous if the costs of all significant activities in the cost pool do not have the same or a similar beneficial or causal relationship to cost objectives and, if the costs were allocated separately, the resulting allocation would be materially different. The determination of materiality shall be made using the criteria provided in [48 C.F.R. § ] 9903.305.

48 C.F.R. §§ 9904.418–40(b), –50(b)(1) to (2).

tion of the materiel overhead pool from the rest of the manufacturing overhead pool, and its allocation using an allegedly compliant base, would result in a materially different allocation of costs to government contracts.

Sikorsky resists the discovery request. Sikorsky primarily contests the need to compare results under different allocation methods when the government has not yet proved that a different allocation method for the materiel overhead pool is required in the first place. *See* Pl.'s Resp. to Def.'s Mot. for Leave to Serve Interrogs. at 4–5. According to Sikorsky, the government must first prove that the costs of the materiel overhead pool did not share the same or a similar relationship to cost objectives as the rest of the costs of the manufacturing overhead pool, before delving into cost allocation comparisons. *See id.*

CAS 418 explains how to determine whether the costs of an indirect cost pool share the same relationship to cost objectives. A regulation requires pooled costs to be "allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives." 48 C.F.R. § 9904.418–40(c). The regulation then specifies two kinds of relationships (which have already been much belabored in this opinion). The first applies where an indirect cost pool contains costs of management and supervision that are material. Because of those costs, such a pool does "not have a direct and definitive relationship to the benefiting cost objectives." *Id.* § 9904.418–50(d)(1). The second pertains to indirect cost pools that do not include material amounts of the costs of management or supervision of activities involving direct labor or direct materiel costs. *Id.* § 9904.418–50(e). In this latter instance, "[h]omogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefiting cost objectives." *Id.* In short, pools *with* significant management costs have an indirect relationship to cost objectives, while pools *without* significant management costs

have a direct relationship to cost objectives. Thus, under Subsection 418–50(d), several indirect cost pools, each *with* significant management costs, may be combined without offending homogeneity because each such pool has the same—that is, indirect—relationship to cost objectives. From this starting point of the relationship between the pool and cost objectives, the appropriate allocation base can then be selected according to the characteristics of the costs in the pool. *See id.* §§ 9904.418–20, .418–40(c)(1) to (2), .418–50(d) to (e).

In this instance, Sikorsky applied its materiel overhead pool to its manufacturing overhead pool and allocated the combined pool using a direct-labor-dollar base. The key question is whether the composite pools "include[d] a material amount of the costs of management or supervision of activities involving direct labor or direct materi[e]l costs." 48 C.F.R. § 9904.418–50(d). If so, then the combined pool would be homogeneous and the selection of a direct-labor-dollar base could be suitable.[26]

As discussed earlier, the question of the significance of the costs of management or supervision is a factual inquiry guided by the materiality standard set out in 48 C.F.R. § 9903.305, and is central to the disposition of this case. Until the key issue of the significance of management costs is resolved, discovery related to other aspects of the relationship of indirect costs in the pool, or homogeneity, is secondary. Therefore, at least for now, "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case . . . and the importance of the discovery in resolving the [more fundamental] issues [at stake in the action]." RCFC 26(b)(2)(C)(iii). The government's motion for leave to serve additional interrogatories must be denied, without prejudice to renewal depending upon how the case develops.

---

26. Additionally, if Sikorsky's selection of a direct-labor-dollar base is appropriate for both materiel overhead and manufacturing overhead costs, then separating the two sets of costs into two indirect cost pools would not result in a different allocation of costs to cost objectives. "Separation into pools accomplishes nothing unless the basis for allocation also is changed." *Hercules Inc. v. United States,* 22 Cl.Ct. 301, 308 (1991).

**CONCLUSION**

For the reasons stated, the court DENIES the government's motion to dismiss Sikorsky's complaint in No. 10–741C, DENIES both of the government's motions *in limine*, and DENIES the government's motion to serve additional interrogatories.

The parties are requested to submit a joint status report on or before March 9, 2012, describing their progress in conducting discovery and projecting when it would be feasible to hold a post-discovery conference. *See* RCFC Appendix A, ¶ 11.

It is so ORDERED.