ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Frazier Investments, Inc. d/b/a/ | ) | ASBCA No. 63001 |
| Optimum Construction | ) | |
| | ) | |
| Under Contract No. FA2823-16-C-4036 | ) | |

APPEARANCE FOR THE APPELLANT:  Mr. John Frazier
                                President

APPEARANCES FOR THE GOVERNMENT:  Caryl A. Potter III, Esq.
                                  Deputy Chief Trial Attorney
                                 Nicholas T. Iliff, Jr., Esq.
                                  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE HERZFELD

Frazier Investments, Inc., which does business as Optimum Construction (Optimum), seeks an equitable adjustment for alleged constructive changes made by the Department of the Air Force (Air Force) during contract performance. The parties have elected to waive a hearing and submit the appeal on the record pursuant to Board Rule 11. For the reasons discussed below, we deny Optimum's appeal.

FINDINGS OF FACT

On September 30, 2016, the Air Force awarded contract No. FA2823-16-C-4036 (Contract), to Optimum for $1,946,339.52 to replace the fire alarm control panel and fire suppression system in a building on Eglin Air Force Base (R4, tab 1 at 1-3).

On November 1, 2016, the Air Force issued a notice to proceed and the parties held a pre-construction conference (R4, tab 3, tab 16 at 1). At the pre-construction conference, however, the Air Force's construction team informed Optimum that the building's tenants anticipated that the work would take place during the night and weekends, not during normal business hours as originally anticipated (R4, tab 16 at 1). Prior to submitting its final proposal revision, Optimum had informed the Air Force that Optimum based its proposal "on being given free access to one floor at a time to install the systems, and offices will have to be unoccupied during the construction" (R4, tab 16 at 4). Given the changed assumptions, the Air Force stopped Optimum from performing (R4, tab 16 at 1). Between November 1, 2016 and April 28, 2017, the parties held "[m]ultiple discussions" to change "all work on the project over to night work to better accommodate the customer[']s mission" (R4, tab 17 at 1).

On April 28, 2017, the Air Force proposed a new statement of work "regarding the upcoming modification" and stated Optimum should "[d]isregard the previous" statement of work (R4, tab 4 at 1). The proposed new statement of work directly addressed working hours: "Regular working hours shall consist of a period between 7 a.m[.] and 6 p.m[.] Monday thru Friday unless otherwise directed by the Contracting Officer and two 12 hours shifts Saturday and Sunday excluding 3 day holidays" (R4, tab 5 at 1). Also, "[a]fter hour work during the week Monday thru Friday shall consist of a period between 6 p.m[.] and 7 a.m[.] the following day" (R4, tab 5 at 1). The proposed new statement of work also provided a new phased sequence of work with some work "recommended" for "day work" and other work recommended for "nights" (R4, tab 5 at 2, tab 6). The revised statement of work also required Optimum to "submit a schedule room by room as to when work will be executed" per the phased sequence of work (R4, tab 5 at 2). Instead of three phases by each floor, the revised statement of work broke the work into significantly more phases (R4, tab 16 at 2).

In response to the revised statement of work, the parties negotiated a modification to pay Optimum additional money based on the proposed changes. On May 12, 2017, Optimum proposed to do the work for an additional $884,130.65, including $243,257.25 for "fire suppression" by its subcontractor, L. Pugh & Associates, Inc. (Pugh) (R4, tab 7 at 1, 3). On August 4, 2017, the Air Force counteroffered $522,945.91 (R4, tab 8 at 1). On August 10, 2017, Pugh wrote Optimum regarding the Air Force's counteroffer, advocating that it should be paid more for design work, but agreeing to lower its proposed number of hours to meet the new requirements (app. supp. R4, tab 1 at 1). On August 11, 2017, Optimum counteroffered $771,333.33, including $165,578.15 for Pugh (R4, tab 9 at 1, 3). On August 25, 2017, the Air Force responded that it would not move from its $522,945.91 counteroffer (app. supp. R4, tab 3). On September 14, 2017, Optimum countered with $441,312.06, including $137,516.96 for Pugh (R4, tab 10 at 1, 3).

After this counteroffer, Optimum alleges that the Air Force asked Optimum to lower its offer below $200,000 or the Air Force would cancel the project (app. br. at 4). Optimum has not offered any direct evidence to support that accusation, just an allegation in its brief.

On September 20, 2017, Optimum provided a new counteroffer for $199,536.84, including only $13,361.50 for Pugh (R4, tab 11 at 1, 3). In that proposal, Optimum stated it based its pricing "on performing the interior work in occupied areas, with only night shifts, working Monday-Friday on a 40 hour schedule" (R4, tab 11 at 2). Optimum also acknowledged that to "salvage the project" it would not be able to perform construction "with one unoccupied floor at a time as it was originally bid" (R4, tab 11 at 1). Optimum acknowledged that "the daily remobilization and demobilization drastically reduces our daily production" (R4, tab 11 at 1). Optimum recognized:

2

> [N]ight work productivity on a military reservation is much
> less than the efficiency of working days, and the productivity
> is further reduced by the building being occupied during the
> day and our crews having to set up and breakdown, tools,
> scaffolds, equipment, materials and protective covers, at the
> beginning and end of each night.

(R4, tab 11 at 1)

Optimum admits it submitted the September 20, 2017 proposal without Pugh's approval (app. br. at 4). Only after Optimum submitted the September 27, 2017 proposal, did Pugh learn the "Modification would only include 948 hours for installation labor and no additional design dollars, no shift premium [for late night work], no allowance for labor price increases in the previous two years, no additional materials, no material price increases" (R4, tab 14 at 3). On January 25, 2018, Pugh complained to Optimum regarding the working conditions that the Air Force demanded (app. supp. R4, tab 4). Pugh acknowledged that the Air Force rejected the prior request "for an overtime rate for the guys having to work nights" and "for additional design time/money to be able to go into occupied areas and figure out the best way to install the systems, since we were no longer going to have a whole floor at a time" (app. supp. R4, tab 4).

On March 21, 2018, despite Pugh's misgivings, representatives for Optimum and the Air Force signed Modification No. P00001 (Modification) to the Contract (R4, tab 12). The Modification stated it was based on "Mutual Agreement of the Parties" and the Contract's Changes clause, FAR 52.243-4 (R4, tab 12 at 1 (Modification), tab 1 at 10 (Contract)). The Modification added a new contract line item number, stating that Optimum would "provide all plant, labor, materials, equipment, transportation and supervision to accomplish after hours and night work as agreed to for the proposal dated 20 Sep 2017" for a firm-fixed price of $199,536.84 (R4, tab 12 at 3). Additionally, the Modification stated:

> SUPPLEMENTAL AGREEMENT: The parties agree that
> this supplemental agreement establishes the consideration for
> modifications effected herein. The parties specifically
> acknowledge and agree that this supplemental agreement
> constitutes full satisfaction of the parties' rights to equitable
> adjustment, under any clause of this contract, relating to the
> modifications effected herein.

(R4, tab 12 at 2)

3

After completing performance, Pugh submitted to Optimum a request for a "comprehensive equitable adjustment" of $91,254 and a contracting officer's final decision under the Contract Disputes Act (CDA) (R4, tab 14 at 2, 4). Pugh complained that it had informed Optimum and the Air Force that the proposals did not include sufficient money to pay for the changes (R4, tab 14 at 2-3). For example, Pugh complained that "[n]o money was allowed to be added to the contract for the additional design" that would result from an inability to work on an entire floor at one time (R4, tab 14 at 3). Pugh learned "that the Modification would only include 948 hours for additional labor and no additional design dollars, no shift premium,[ ] no allowance for labor price increases in the previous two years, no additional materials, no material price increases, and that the time for the actual project duration was decreased" (R4, tab 14 at 2). Pugh acknowledged, "We can't exactly say all the problems were unforeseen as [Pugh] had priced many of them into the proposals, however, the Owner refused to believe they were there and would not include the funds in the Modification as requested" (R4, tab 14 at 3).

On November 25, 2019, Optimum forwarded the claim to the Air Force stating that its "subcontractor" Pugh was "requesting the Final Decision" (R4, tab 14 at 1). In an email transmitting the request, Optimum stated, "we feel their claim is not valid or warranted and we surely do no[t] stand behind it. The contract modification that was issued for the night work was negotiated for months and understood by all including Optimum and all key subcontractors" (R4, tab 13). Optimum acknowledged that Pugh's request had "really caught us off-guard" and that "this claim is by no way supported by the Optimum management team" (R4, tab 13).

On March 23, 2020, the Air Force responded that the Modification "clearly stated that the added days and consideration constituted full satisfaction of both parties right to equitable adjustment via the supplemental agreement" (R4, tab 15). However, the Air Force refused to issue a contracting officer's final decision in response to Pugh's unsponsored claim: "Subcontractors . . . do not have the right to seek and collect contract damages from the Government pursuant to the CDA because they are not in contractual privity with the Government" (R4, tab 15).

On February 16, 2021, Optimum submitted a claim to the Air Force seeking $98,695, including Pugh's costs of $90,621 and Optimum's $8,074 for overhead, profit, and subcontractor bonding costs (R4, tab 16 at 30). Optimum stated its "bid proposal for the modification initially included additional design services to perform the work in phases, but the government removed that cost because it was deemed unnecessary" (R4, tab 16 at 2). The "proposal also included additional cost and inefficiencies to work nights, but this was also removed" by the Air Force project manager (R4, tab 16 at 2). However, as Optimum explained, "Once the modification was issued, we were required to work 100% of the interior work at night and we were required to design and construct the project in (16) separate phases. This caused major cost overruns in labor, design and

4

equipment" (R4, tab 16 at 2). Optimum claimed increased labor, design, and material costs based on the requirement to work nights and divide the project into 16 phases instead of just three phases of working one floor at a time during the day (R4, tab 16 at 2, 32-33).

On May 4, 2021, the contracting officer issued a final decision denying Optimum's claim (R4, tab 17). The Air Force concluded that the Modification covered all the claimed costs because the Modification "clearly references Optimum's proposal dated 20 Sept 2017," which "clearly states Optimum[']s understanding that all interior work shall be preformed [sic] at night and that the original agreed upon plan of one floor at a time would not be feasible and a phased approach would be the only option" (R4, tab 17 at 2). The Air Force determined that Optimum had "waived" any rights to compensation for subsequent costs covered by the Modification (R4, tab 17 at 2).

On July 29, 2021, Optimum timely appealed the contracting officer's final decision. Initially, Optimum elected to use the accelerated procedures in Board Rule 12.3. The Board set the hearing date for January 26, 2022, as requested by the parties. On December 30, 2021, appellant requested postponement of the hearing and later requested that this appeal be removed from the accelerated procedures track. The parties then opted to present this appeal under Board Rule 11, submitting briefs for decision without a hearing.

## DECISION

### I. Standard of Review

Board Rule 11 permits parties to waive a hearing and submit their appeal on the record. ASBCA Rule 11(a). "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'" *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13). As the proponent of the claim, Optimum bears the burden of proof. *FlightSafety Int'l, Inc.*, ASBCA No. 62659, 23-1 BCA ¶ 38,245 at 185,709. As the proponent of any affirmative defense, the Air Force bears the burden of proof. *Alion Science & Tech. Corp.*, ASBCA No. 58992, 15-1 BCA ¶ 36,168 at 176,489.

### II. Optimum Has Failed to Prove Entitlement to an Equitable Adjustment

Optimum asserts entitlement to an equitable adjustment based on increased costs encountered for constructive changes under the Contract, but we hold that there were no changes beyond the requirements of the Modification. Indeed, Optimum's subcontractor – Pugh – foresaw that the Modification was insufficient to pay for the changes but

5

Optimum agreed to the Modification anyway.  On the flip side of Optimum's claim for constructive changes, the Air Force also asserts that the Modification resulted in an accord and satisfaction.  We agree.

Optimum also asserts it faced duress from the Air Force to sign the Modification, but we conclude that the Air Force acted appropriately.  Finally, Optimum essentially asserts that the Modification was unconscionable because the Air Force should have realized that Optimum had submitted a below-cost offer to do the night work.  We hold that Optimum has failed to demonstrate unconscionability.

### A.   Optimum Has Failed to Prove It Incurred Increased Costs Based on a Constructive Change

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government."  *Int'l Data Prods. Corps. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)).  "If a contractor performs work that cannot be characterized as additional work under the contract, it does not constitute a change."  *South Bay Boiler Repair, Inc.*, ASBCA No. 59281, 17-1 BCA ¶ 36,634 at 178,426 (citing *Int'I Data*, 492 F.3d at 1325).  Like a formal change under the Changes clause, "the contractor must prove increased costs compared to what is otherwise required by the contract" to recover for a constructive change.  *Charles F. Day & Assocs. LLC*, ASBCA No. 60211, 19-1 BCA ¶ 37,215 at 181,175; *see also Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014) ("To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government.").

The Air Force did not require Optimum to perform work beyond the Contract's requirements.  The Modification provided consideration for the changes for which Optimum now seeks recovery – costs primarily incurred by its subcontractor, Pugh.  Optimum's claim seeks increased costs that were not only foreseeable during negotiations, but Pugh foresaw them and begged Optimum to make sure they were incorporated into the Modification.  Optimum ignored Pugh's warnings.

In particular, Optimum seeks costs that were covered by the Modification, which incorporated by reference Optimum's September 20, 2017 proposal (R4, tab 12 at 2-3).  Optimum's claim seeks reimbursement for the labor, design, and material costs based on the requirement to work nights and divide the project into 16 phases instead of just three phases of working one floor at a time during the day (R4, tab 16 at 2, 32-33).  Yet, the Modification stated that Optimum "will provide all plant, labor, materials, equipment, transportation and supervision to accomplish after hours and night work as agreed to for the proposal" (R4, tab 12 at 3).  The Modification incorporated Optimum's proposal,

6

which acknowledged that Optimum would not be able to perform "with one unoccupied floor at a time" as it originally bid (R4, tab 11 at 1). Optimum's proposal acknowledged that working nights would be less efficient and less productive because the crews would have "to set up and breakdown, tools, scaffolds, equipment, materials and protective covers, at the beginning and end of each night" (R4, tab 11 at 1). Thus, the Modification required the precise work Optimum now claims was changed after the Modification.

Moreover, the parties agreed to the Modification with the additional costs added as a firm-fixed price contract line item (R4, tab 12 at 3). "The essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs." *Lakeshore Eng'g Serv., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014); *see also Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1361 (Fed. Cir. 2016) ("'A firm-fixed price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing,' 48 C.F.R. § 16.202–1, and generally sets forth a fixed scope of work."); FAR 16.202-1 ("This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."). Optimum agreed to take on the risk of failing to perform the changes in the Modification for the proposed firm-fixed price of $199,536.84.

Optimum and Pugh understood that they were agreeing to a fixed price that would not pay for all its costs. Indeed, Optimum admits that it submitted the September 20 proposal without Pugh's approval (app. br. at 4). Before signing the Modification, Pugh apprised Optimum of its concerns with the September 20 proposal because the proposed price would not fully pay for Pugh's work covered by the Modification's changed requirements (app. supp. R4, tab 4). Pugh complained that the Air Force included no additional money for design costs, overtime work, labor price increases, additional materials, or material price increases (R4, tab 14 at 3; app. supp. R4, tab 4). Pugh noted that these additional costs mainly were driven by the inability to perform on an unoccupied floor – one floor at a time, in three phases – and the Modification's requirement that Pugh and Optimum break up the work into significantly more phases (that resulted in a 16-phase project) (app. supp. R4, tab 4; R4, tab 16 at 2). Nevertheless, Optimum ignored its subcontractor Pugh during the negotiations and executed the Modification without including all the costs Pugh had sought.

When performance concluded, Optimum was caught "off-guard" by Pugh's attempt to recover costs and told the Air Force that Pugh's "claim is not valid or warranted" and initially would not "stand behind it" (R4, tab 13). Optimum stated, "The contract modification that was issued for the night work was negotiated for months and understood by all including Optimum and all key subcontractors" (R4, tab 13). Optimum now asserts that its official made this statement to "protect their reputation" and because the individual more familiar with the contract negotiations had died (app. br. at 5). Regardless, the facts support Optimum's original assessment (before it agreed to sponsor Pugh's claim). The claim is not warranted. Ultimately, we conclude that Optimum has

7

failed to prove any constructive changes that resulted in work beyond that required by the Modification.

### B. Accord and Satisfaction Also Bars Optimum's Claim

The Air Force asserts that the Modification added these requirements and paid Optimum additional money for these changes (gov't br. mot. at 8-9). In particular, the Air Force asserts that the Modification "satisfied" any obligation owed to Optimum (R4, tabs 15, 17 (contracting officer's final decision and initial response to Pugh's unsponsored claim)). In effect, the Air Force invokes the defense of accord and satisfaction based on the language of the Modification.

The Air Force did not specifically plead this defense in its answer. However, the evidence in the record and the parties' arguments implicate this defense. The Board may permit amendment of the "pleadings to conform to the proof" presented during a hearing or Rule 11 briefing if within the "proper scope of the appeal." ASBCA Rule 6(d). Moreover, accord and satisfaction is a common-law affirmative defense, which is not subject to a contracting officer's final decision because the defense neither seeks the payment of money nor the adjustment of contract terms. *See Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1362-63 (Fed. Cir. 2018) ("[I]f a party raises an affirmative defense under the contract as written—for example, common-law defenses of fraud or prior material breach—it need not first be presented to the CO for a final decision, since a defense is not a claim for money, and the CO has no necessary role in assessing the defense."); *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1368 (Fed. Cir. 2016) (concluding that affirmative defense of fraud was not a CDA "claim" because "the government's defense plainly does not seek the payment of money or the adjustment or interpretation of contract terms"); *Sikorsky Aircraft Corp. v. United States*, 102 Fed. Cl. 38, 44 & n.14 (2011) (noting that plaintiff's "affirmative defenses" of accord and satisfaction, waiver, laches, and statute of limitations constituted "traditional common law defenses that are independent of the means by which a party seeks equitable adjustment to a government contract" and, thus, could be raised without a contracting officer's final decision).

"Accord and satisfaction denotes 'one of the recognized methods of discharging and terminating an existing right' and constitutes 'a perfect defense in an action for the enforcement of a previous claim, whether that claim was well founded or not.'" *Chesapeake & Potomac Tel. Co. v. United States*, 654 F.2d 711, 716 (Ct. Cl. 1981) (quoting 6 CORBIN ON CONTRACTS § 1276 (1962)). As we would for any other contractual document, we look to the plain language of an accord and satisfaction. *Pyrotechnic Specialties, Inc.*, ASBCA No. 57890, 17-1 BCA ¶ 36,696 at 178,703, *aff'd*, 835 F. App'x 607 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 344 (2021).

The Modification included the following language:

> SUPPLEMENTAL AGREEMENT:  The parties agree that this supplemental agreement establishes the consideration for modifications effected herein.  The parties specifically acknowledge and agree that this supplemental agreement constitutes full satisfaction of the parties' rights to equitable adjustment, under any clause of this contract, relating to the modifications effected herein.

(R4, tab 12 at 2)

The Modification demonstrates an accord and satisfaction.  *Consolidated Indus., Inc. v. United States*, 195 F.3d 1341, 1344-45 (Fed. Cir. 1999) (concluding that a modification resulted in an accord and satisfaction barring contractor's excusable delays claims).  "To prove accord and satisfaction, the government must show (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration."  *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009) (internal quotation and citation omitted).  Here, the subject matter was proper – changing some of the terms of performance to require night work and increasing the number of phases to perform the work (R4, tab 11 at 1, tab 12, tab 16 at 2).  Optimum has presented no evidence that the parties were not competent to make this agreement.

"A meeting of the minds occurs where there are 'accompanying expressions sufficient to make the [claimant] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise.'"  *Holland v. United States*, 621 F.3d 1366, 1382 (Fed. Cir. 2010) (quoting *Chesapeake & Potomac Tel.*, 654 F.2d at 716).  Here, the parties had a meeting of the minds regarding the coverage of the Modification.  Optimum would "provide all plant, labor, materials, equipment, transportation and supervision to accomplish after hours and night work as agreed to" in Optimum's incorporated proposal (R4, tab 12 at 3).  Optimum expressed its understanding in the incorporated proposal that any modification would cover the costs of not being able to work on one unoccupied floor at a time (*i.e.*, in three phases) (R4, tab 11 at 1).

Finally, the Modification's accord and satisfaction language acknowledged that the Modification "constitutes full satisfaction of the parties' rights to equitable adjustment, under any clause of this contract" and "establishes the consideration" for the changes (R4, tab 12 at 2).  The Modification included the Air Force's consideration of $199,536.84 to pay for Optimum's performance of the changed work (R4, tab 12 at 3).  Thus, the Modification constituted an accord and satisfaction, which bars Optimum's claims here.

9

## C. No Duress or Unconscionability

Optimum asserts that the Air Force used duress to coerce Optimum into signing the Modification by threatening to cancel the contract (app. br. at 8; app. reply at 2). Optimum also asserts that the Air Force violated FAR 36.214 by agreeing to sign the below-cost Modification – essentially an unconscionability argument (app. br. at 4-5; app. reply at 1). The Air Force asserts that the Board lacks jurisdiction to hear the duress legal theory (and presumably FAR 36.214, which the Air Force does not mention) because they constitute new claims that Optimum failed to raise before the contracting officer (gov't br. at 15 n.1). And, even if we have jurisdiction, the Air Force asserts Optimum has failed to prove any basis for recovery (gov't br. at 15 n.1). We conclude that we have jurisdiction, but deny Optimum any recovery based on these legal theories.

### 1. The Duress and Unconscionability Theories Are Not New Claims

Before reaching the merits, we must address the Air Force's assertion that the new legal theories constitute new claims that were not presented to the contracting officer. We hold that they are not new claims.

"[O]btaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim" under the CDA. *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 776 (Fed. Cir. 2021); 41 U.S.C. §§ 7103(a)(3), 7104(a). We do not possess jurisdiction over any "new" claim that was not presented to the contracting officer. *Anthony & Gordon Constr. Co.*, ASBCA No. 61916, 21-1 BCA ¶ 37,887 at 184,000. "[W]e examine whether that claim is the 'same claim' as the one presented to the contracting officer" and "consider the remedies sought and the elements of the claims in assessing whether the sameness requirement is met." *Tolliver*, 20 F.4th at 776 (internal citations and quotations omitted). We assess whether the new legal theories derive from "a different or unrelated set of operative facts." *Lee's Ford Dock, Inc. v. Sec'y of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017) (internal quotation omitted). In assessing the scope of a claim "we are not limited to the claim document but can examine the totality of the circumstances." *Dawson-Alamol JV, LLC*, ASBCA No. 60590, 19-1 BCA ¶ 37,357 at 181,645 (internal quotation and citation omitted).

Here, Optimum seeks the identical remedy for each of its legal theories – payment of $98,695. Additionally, Optimum relies on evidence (to the extent it can adduce any) for these theories that derives directly from Optimum's (or Pugh's) pursuit of a claim before the contracting officer (R4, tabs 14, 16) or the proposal incorporated by reference into the Modification (R4, tab 11). In fact, Optimum attached the Modification to its claim to the contracting officer (R4, tab 16 at 11-15). Thus, these new legal theories rely on the same operative facts before the contracting officer and do not constitute new claims.

10

## 2. *Optimum Did not Sign the Modification Under Duress*

To render the Modification unenforceable for duress, Optimum must establish that (1) the contractor involuntarily accepted the government's terms, (2) circumstances permitted no other alternative, and (3) the government's coercive acts caused the contractor to involuntarily accept the government's terms and offered no alternative. *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329-30 (Fed. Cir. 2003) (internal citations omitted). To demonstrate coerciveness, "requires proof of wrongful action by the government" – an action that was "(1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing." *Id*. at 1330.

Here, Optimum appears to be asserting that the Air Force's coercive actions breached the implied covenant of good faith and fair dealing by threatening to cancel the contract unless Optimum reduced its price for the Modification under $200,000 (app. br. at 4; R4, tab 16 at 1-2 (Claim)). Notably, there is no allegation of illegality or breach of an express provision of the Contract, so we understand the duress allegation to relate to a breach of the implied covenant of good faith and fair dealing.

In making this allegation in its brief, Optimum notes that the threat was "verbal" (app. br. at 4), but provides no direct evidence to support its assertion. Instead, Optimum relies on two pieces of circumstantial evidence presented with its certified claim: (1) the September 20, 2017 proposal, which noted that Optimum presented the proposal "to salvage the project that we are told cannot be constructed with one unoccupied floor at a time as it was originally bid," and (2) Optimum's reduction of its price below $200,000 (R4, tab 11 at 1; app. br. at 4). This circumstantial evidence is thin. Indeed, Optimum neither says which Air Force official made this alleged threat nor which Optimum official heard this "verbal" threat. Perhaps Optimum means to rely on the now-deceased individual who negotiated the Modification for Optimum. However, Optimum can only speculate about why the individual lowered the price, but then acknowledges that Optimum (and this individual presumably) previously lowered its price "[f]or no known or written reason" during negotiations of the Modification (app. br. at 4). Thus, based on the scant evidence presented, we conclude that Optimum has failed to prove that the Air Force issued such a threat. *Al Maweed Marine Servs. PTE, Ltd.*, ASBCA No. 48124, 98-1 BCA ¶ 29,455 at 146,222 (concluding that a "bare allegation does not suffice" to prove duress).

Even assuming for the sake of argument that the Air Force made such a threat (and there is insufficient evidence to prove such a threat), the Air Force's actions do not rise to the level of duress. "A threat by a party to a contract not to perform a contract duty is not, of itself, improper, and an agreement of modification or rescission induced by such a threat may be binding on both parties." 1 E. ALLAN FARNSWORTH & ZACHARY WOLFE, FARNSWORTH ON CONTRACTS § 4.17 (4th ed. 2019 Supp. 2023).

11

Optimum asserts that the Contract guaranteed it would be able to work on one floor at a time, but bases the claim on an assumption in its final proposal revision (R4, tab 16 at 1-2, 4). However, the parties did not include that clarification as part of the terms of the Contract, which was silent regarding this issue (R4, tab 1 at 25 (attaching only the statement of work and the wage/rate determination to the Contract); R4, tab 2 (statement of work includes no reference to phasing of project)). As noted above, it was only at the pre-construction conference that the Air Force realized that performance could not go forward as Optimum hoped (R4, tab 16 at 1). After the pre-construction conference, the Air Force would not have abused its discretion or acted in bad faith by terminating the Contract for convenience, given that the Contract did not address this requirement and the Contract included a termination for convenience clause. *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) ("When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach."); (R4, tab 1 at 10 (incorporating by reference FAR 52.249-2 Alt I – TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APR 2012) – Alternate I (SEPT 1996)). Thus, based on the facts here, the alleged threat to terminate for convenience (or "cancel" as alleged by Optimum), constituted a legitimate contractual remedy if the parties could not reach agreement on a modification. *See David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981) (concluding there was no duress where the government properly invoked contract remedies as basis to induce contractor to sign modification).

Instead of pursuing termination, the Air Force worked with Optimum to modify the Contract to provide additional funds to pay Optimum for the costs of working nights without working one floor at a time (R4, tabs 4-12). After Optimum's September 20, 2017 proposal lowered the price for the change order to less than $200,000 (without Pugh's approval), Pugh later complained to Optimum that any modification subject to those terms would not fully pay Pugh for the costs of performance (app. supp. R4, tab 4). Pugh registered these concerns to Optimum on January 25, 2018, and requested that any modification incorporate its concerns (app. supp. R4, tab 4). Optimum nevertheless opted to execute the Modification two months later without incorporating any language to allay Pugh's concerns that the proposal did not fully pay for all changes (R4, tab 12). Optimum cannot now shift the blame to the Air Force for Optimum's decision to ignore its subcontractor's concerns. "[E]conomic pressure caused by a company's own flawed business decision does not support a finding of duress." *Charles F. Day & Assocs.*, 19-1 BCA ¶ 37,215 at 181,177. Thus, Optimum has failed to prove duress.

12

### 3. The Modification was not Unconscionable

Optimum complains that the Air Force acted inappropriately by failing to follow the FAR's procedures for price negotiation in construction contracting, which states: "When a proposed price is significantly lower than the Government estimate, the contracting officer shall make sure both the offeror and the Government estimator completely understand the scope of the work." FAR 36.214(b)(2). Optimum presses that the Air Force's counteroffer of $522,945.91 (which it later withdrew for a reduced offer during negotiations), constituted an "estimate" of the price of the work (R4, tab 8 at 1), that the Air Force was somehow bound by this amount, and that this was evidence that the parties did not understand the scope of the work required by the Modification (app. br. at 7-8). Optimum essentially asserts that the Air Force acted unconscionably by accepting Optimum's below-cost proposal to perform the work covered by the Modification (app. br. at 4; app. reply br. at 1). We disagree.

An unconscionable contract "shocks the conscience" and we associate it with "such concepts as 'overreaching,' 'taking undue advantage,' 'bad faith,' 'unfairness,' and 'unjust enrichment' and have stated that it is 'indistinguishable from the other party's knowledge or reason to know of a mistake.'" *Macro-Z Tech.*, ASBCA No. 56711, 12-1 BCA ¶ 35,000 at 172,006 (citation omitted). An unconscionable contract provision is "one which no man in his senses, not under a delusion, would make, on the one hand, and which no fair and honest man would accept on the other." *Glopak Corp. v. United States*, 851 F.2d 334, 337 (Fed. Cir. 1988) (internal citations and quotations omitted). We find a contract or modification unconscionable "only in exceptional circumstances." *Macro-Z Tech.*, 12-1 BCA ¶ 35,000 at 172,006-07 (internal citation and quotation omitted).

Optimum has failed to prove that the Air Force acted unconscionably by somehow violating FAR 36.214(b)(2).

First, it is unclear whether the counteroffer constituted a formal "estimate" under FAR 36.214 or was simply a negotiated counteroffer based on Optimum's initial offer.

Second, even if the counteroffer constituted an estimate, any disparity between that original counteroffer and the final proposal of $199,536.84 (R4, tab 11 at 1, 3) is not alone proof that the Air Force was "getting something for nothing." *Macro-Z Tech.*, 12-1 BCA ¶ 35,000 at 172,008 ("Disparity in bid prices alone, or disparity in bid prices in connection with a Government estimate alone does not establish that the contracting officer knew or should have known that the Government was getting something for nothing." (internal quotation and citation omitted)). Optimum must show overreaching or bad faith by the Air Force beyond any price disparity. *Id*. Optimum has failed to point to any evidence establishing overreach or bad faith. Indeed, if anything, Optimum's negotiating position significantly overestimated its likely costs. Optimum originally

13

priced the changes as $884,130.65 (R4, tab 7 at 3), which was significantly higher than the ultimate cost Optimum now asserts it incurred to perform – approximately $300,000 (which adds together the Modification's $199,536.84 firm-fixed price that the Air Force paid (R4, tab 12 at 3) and Optimum's $98,695 claim amount (R4, tab 16 at 3)).

Third, as noted above, the parties entered a firm-fixed price Modification (R4, tab 12). Because the contractor bears the risk, the government may accept below-cost offers for firm-fixed price contracts and modifications. *See CC Distributors, Inc. v. United States*, 69 Fed. Cl. 277, 283 (2006) ("[I]n fixed-price contracting, below-cost pricing is not prohibited and the government cannot withhold an award from a responsible offeror merely because its low offer is below cost." (internal citation and quotation omitted)). Thus, the Air Force acted permissibly in accepting Optimum's proposal even if it was below-cost. Optimum has failed to demonstrate unconscionability.

<u>CONCLUSION</u>

For the reasons discussed above, we deny Optimum's appeal.

Dated: March 13, 2023

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63001, Appeal of Frazier Investments, Inc. d/b/a Optimum Construction, rendered in conformance with the Board's Charter.

Dated:  March 13, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals